No. 83,312

CHARLINE DAVIS, *Appellant*, v. STEVEN K. MILLER, *Appellee*.

(7 P.3d 1223)

Opinion filed July 14, 2000.

*Lee H. Woodard*, of Woodard, Hernandez, Roth & Day, L.L.C., of Wichita, argued the cause and was on the briefs for appellant.

*Eldon L. Boisseau*, of Turner & Boisseau, Chtd., of Wichita, argued the cause, and *Thomas L. Steele*, of the same firm, was with him on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J.: The appellant, Charline Davis, appeals the district court's dismissal of her suit against her ex-husband/appellee, Steven K. Miller, and the award of attorney fees against her. Davis sought damages for fraud and breach of warranty arising from a postnuptial agreement alleging that Miller failed to make a complete disclosure of the value of his assets. In his counterclaim, Miller seeks attorney fees under an indemnity provision in the agreement. The district court granted summary judgment against Davis and awarded attorney fees to Miller pursuant to his counterclaim. We have jurisdiction over this appeal pursuant to K.S.A. 20-3018(c).

Davis and Miller were married on April 1, 1967. Miller filed for divorce on March 7, 1994. The couple had substantial marital assets, with the primary asset being Miller's ownership of 72.2% of General Financial Services (GFS), a company he founded in 1988. It is GFS's value that is at the center of this appeal. The couple also had significant interests in closely held corporations, a family home, substantial IRA accounts, and other real property.

On December 19, 1994, Davis and Miller executed a postnuptial agreement and reconciled. In November 1995, Miller again filed for divorce, and on January 3, 1996, a journal entry and decree of divorce incorporating the postnuptial agreement was entered in that action.

Davis now contends that she was not fully informed as to the value of Miller's interest in GFS and has brought suit alleging both fraud and breach of warranty. Because the value of GFS is, in part, at issue, a summary of GFS and its operations follows.

GFS is in the business of purchasing distressed nonperforming real estate loans for the purpose of making a profit by collecting on the loans and/or selling the underlying collateral. The loans and collateral were located throughout the United States, and the loans in a package could vary substantially in number and amount. Miller had control over the operations of GFS, and the company was very successful.

GFS purchased loan packages through sealed bids or at auction. The amount to be bid was determined after GFS performed due diligence to obtain information for the purpose of evaluating the loan package. After the loan package was acquired, even more information would be discovered. Sometimes this revealed a loan package had greater value than the original evaluation, and sometimes it would reveal that a loan package had less value than originally thought. GFS employees had special expertise which few people in the county possessed and which no one else in Wichita apparently had. GFS employees used their expertise to value loan packages, both during the due diligence phase and after the loan packages were acquired. In summary, the loan packages were acquired by GFS because it was willing to pay more than any other bidder.

GFS utilized generally accepted accounting principles and stated its assets and liabilities using "book value." The book value of GFS's loan packages was the unrecovered costs of its assets, most of which were the loan packages. The unrecovered costs of a loan package was the balance remaining after collections were applied to the purchase prices, interest was paid to investors, and all accrued collection costs that had been incurred.

After Miller first filed for divorce in March 1994, he continued to live in the family home with Davis. Davis and Miller negotiated and agreed to many of the terms contained in the postnuptial agreement at that time. None of the items agreed upon by Davis and Miller at the time depended on the value of GFS and the other business entities.

In the spring of 1994, a financial statement was prepared entitled "Steve and Charline Miller [now Davis], Statement of Assets and Liabilities, Estimated Fair Market Value Basis, December 31, 1993." The asset section of the statement indicated that some of the assets, including GFS stock, were shown as unrecovered costs. The financial statement further stated that "unrecovered costs [were used] as a method of estimating the fair market value." Miller disclosed to Davis and her attorney and accountant that GFS had expectations of future potential profits not reflected on the financial statement, but neither Davis nor her attorney made a request for an adjustment to the allocation of assets based on the disclosures of anticipated profits. Miller told Davis that he valued the company based on book value as it was difficult to determine future cash flow until collections on the loans were completed.

Davis made no attempt to independently value GFS. Davis and her attorney felt that it would be too expensive to do an independent evaluation of GFS as the properties were located throughout the United States. Davis was given a July 31, 1994, balance sheet showing GFS assets of $10,170,000, which was approximately a $6 million dollar increase from the December 31, 1993, financial statement. Davis was told that "monthly target" reports were generated; however, she never requested copies of the reports. Davis was also told that GFS generated year-to-date collection reports, but she never requested those either. Davis was told several times that GFS anticipated selling all assets for more than the amount they were carried on the books, but again no request was made seeking any financial statements which might show anticipated projections of this type. Davis undertook no formal discovery because she felt that it would hurt her chance to reconcile with Miller.

Davis was an investor in GFS before, during, and after the pendency of the actions between the parties and received periodic

investor reports concerning the status of her investments. The reports included the total projected collections for each investment.

Davis' attorney advised her to sign the postnuptial agreement, based on the information contained in the December 31, 1993, financial statement and advised her that the property settlement was within the range of what a court would award as an equitable division of property. On December 19, 1994, Davis and Miller executed the final version of the postnuptial agreement. Davis received substantial assets pursuant to the agreement. The agreement provided that Davis would receive the family residence valued at $370,378; power motor boat and vehicle valued at $51,500; $100,000 cash; her bank accounts; a promissory note in the principal amount of $1,073,000 bearing interest of 5% per annum nontaxable to Davis; one-half of the parties' IRA accounts valued at $260,321; and one-half of the parties' personal property. The promissory note pays Davis $11,380.93 per month for a period of 10 years. The note is fully collateralized, and all amounts are received tax free. In addition, Davis is the beneficiary of a $500,000 life insurance policy. Davis was also indemnified from loss concerning Miller's companies' promissory notes on which she was either a comaker or guarantor. Davis was also indemnified from the parties' federal and state tax returns, which were being challenged by the IRS, and from any possible tax assessments arising out of the IRAs.

On January 2, 1997, Davis filed this instant action, alleging fraud and breach of contract. Davis alleged that GFS generated "remaining value reports," which valued the company on a "fair market value" basis rather than a "book value basis," and that she would not have signed the postnuptial agreement had she known that the "fair market value" of GFS was significantly more than the "book value." The "remaining value reports" did not include overhead expenses, and Miller regarded them as "mere optimistic estimations, opinions, and best guesses." The reports that Davis received as an investor contained projections on collections and were based on the same information used in the "remaining value reports."

During discovery for this action, it was discovered that Miller signed a personal financial statement for Bank IV in Wichita in

which he stated that his interest in GFS had a book value of $1,389,600 and an estimated market value of $2,779,200. Miller had also prepared a personal financial statement for Commerce Bank in Wichita in which he reported that his interest in GFS was worth $3,000,000.

Davis asserts that had she known that GFS had a fair market value that was more than twice the book value, she would not have signed the postnuptial agreement.

The district court dismissed Davis' case on summary judgment, finding that Davis could not bring a cause of action for either fraud or breach of warranty as the postnuptial agreement was governed by the Kansas Uniform Premarital Agreement Act (KUPAA), K.S.A. 23-801 *et. seq.*, and further finding that Davis could only void the agreement under the enforcement provisions of the KUPAA. The district court also awarded attorney fees in the amount of $315,107.04 to Miller.

The standard of review for issues decided on summary judgment is well known. Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The district court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with the evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and where we find that reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied. *Bergstrom v. Noah*, 266 Kan. 847, 871-72, 974 P.2d 531 (1999).

Several issues have been raised on this appeal: (1) whether the KUPAA applies to the parties' postnuptial agreement; (2) whether the KUPAA prevents a party from bringing a subsequent tort action for either fraud or breach of warranty; (3) whether the district court erred in finding that Davis entered into the agreement voluntarily;

(4) whether the district court erred in finding that the agreement was not unconscionable; (5) whether the district court erred in finding that Davis was provided a fair and reasonable disclosure of Miller's property; (6) whether the district court erred in finding that Davis voluntarily and expressly waived the right to any disclosure of Miller's property; (7) whether the district court erred in finding that Davis had adequate knowledge of Miller's property; (8) whether the district court erred in finding that Miller's claim for attorney fees came within the parameters of the postnuptial agreement; and (9) whether the district court erred in awarding attorney fees to Miller.

## I. APPLICATION OF THE KANSAS UNIFORM PREMARITAL AGREEMENT ACT

Although the postnuptial agreement contains a provision which expressly states that "[t]he parties agree that this Agreement is fair, just and reasonable, and comports with all legal requirements so as to be *fully enforceable under the Kansas Uniform Premarital Agreement Act under K.S.A. 23-801 et seq.*," (emphasis added) and although the parties had the advice of counsel before signing the agreement, and although both parties knew the contents of the postnuptial agreement, Davis argues that the KUPAA cannot be applied to the postnuptial agreement.

The interpretation and legal effect of contracts are matters of law, and an appellate court exercises unlimited review. *City of Topeka v. Watertower Place Dev. Group*, 265 Kan. 148, 152-53, 959 P.2d 894 (1998); *Friday v. Trinity Universal of Kansas*, 262 Kan. 347, 348-49, 939 P.2d 869 (1997).

The Kansas Legislature passed the KUPAA on July 1, 1988. L. 1988, ch. 204, § 1. The Act was modeled after the Uniform Premarital Agreement Act (UPAA), which was approved by the National Conference of Commissioners on Uniform State Laws in 1983. 9B U.L.A. 371 (1987). The Prefatory Note to the UPAA states that the Act is limited in scope and that it does not "provide for postnuptial or separation agreements." The ULA Comment to § 1 of the Act specifically notes that "postnuptial or separation agreements are outside the scope of this Act." 9B U.L.A. 371.

K.S.A. 23-801, K.S.A. 23-802, and K.S.A. 23-811 limit the application of the Act to "premarital agreements" and define a premarital agreement as one made "in contemplation of marriage." See also 1 Elrod and Buchele, Kansas Law and Practice: Kansas Family Law § 2.1, p. 92 (West 1999) (noting that the KUPAA does not cover nonmarital or postnuptial agreements).

The KUPAA does not apply to postmarital agreements and was not enacted for that purpose. Parties entering into a postmarital agreement are in a vastly different position than parties entering into a premarital agreement. See *Pacelli v. Pacelli*, 319 N.J. Super. 185, 190, 725 A.2d 56 (1999) (noting that the dynamics and pressures involved in a mid-marriage context are qualitatively different than a pre-marriage situation).

Despite the legislative intent and the clear language of the KUPAA, parties can bind themselves to the provisions of an otherwise inapplicable act by incorporating choice of law provisions in an enforceable contract. As long as application of a statute or act is not contrary to public policy, a court will uphold application of an otherwise inapplicable statute or act. The parties agreed in paragraph 29 of the settlement agreement to apply the KUPAA to their postmarital contract. The clear intent of the parties was to apply the KUPAA to their agreement. There is no public policy reason to prevent the parties from incorporating the provisions of the KUPAA to their postmarital agreement. The district court correctly ruled that the parties had incorporated the provisions of the KUPAA into their postmarital agreement and that they are thereby bound by the terms of the contract. Although our analysis of the KUPAA may involve case law concerning the UPAA or prenuptial agreements, its application is only appropriate, given the parties' choice of applying the KUPAA to their postnuptial agreement. Otherwise, the KUPAA and case law concerning prenuptial agreements would not apply.

The purpose of the KUPAA is to create a uniform set of rules regarding the *enforceability* of premarital agreements. K.S.A. 23-810. The KUPAA contains an *enforcement* provision in K.S.A. 23-807 which reads in pertinent part:

"(a) A premarital agreement is not enforceable if the party against whom enforcement is sought proves either of the following:

(1) That party did not execute the agreement voluntarily; or

(2) the agreement was unconscionable when such agreement was executed and, before execution of the agreement, all of the following applied to that party:

(A) Such party was not provided a fair and reasonable disclosure of the property or financial obligations of the other party;

(B) such party did not voluntarily and expressly waive, in writing, any right to disclosure of the property or financial obligations of the other party beyond the disclosure provided; and

(C) such party did not have, or reasonably could not have had, an adequate knowledge of the property or financial obligations of the other party."

Davis argues that she is not seeking to declare the postnuptial agreement to be "unenforceable" pursuant to K.S.A. 23-807, but that this litigation is collateral to the divorce and that she is affirming the agreement but seeking tort damages for fraud and breach of warranty.

The district court correctly held the KUPAA controls this case.

## II. VOLUNTARY EXECUTION OF THE AGREEMENT

In considering the enforcement provisions of the KUPAA, the district court ruled that Davis entered into the postnuptial agreement voluntarily, thereby precluding Davis from using K.S.A. 23-807(a)(1) as a means to strike down the agreement.

The burden of proof is on the party attacking the marital agreement and asserting that it is not enforceable pursuant to K.S.A. 23-807. See 1 Elrod and Buchele, Kansas Family Law § 2.3, p. 102; Comment to § 6 of the UPAA, 9B U.L.A. 376. See also *In re Marriage of Iverson*, 11 Cal. App. 4th 1495, 1502, 15 Cal. Rptr. 2d 70 (1992) (the UPAA is framed in such a way as to place the burden of proof on the party alleging that the agreement is not enforceable).

Davis argues that because Miller did not fully disclose his assets, she did not enter into the agreement voluntarily. By making this argument, Davis merges her fraud argument with the "voluntariness" requirement found in K.S.A. 23-807(a)(1). Her action for fraud is independent and separate from the enforcement provisions found in the KUPAA, and although failure to disclose can sometimes indicate that a party has entered into an agreement

involuntarily, it is not dispositive of the issue. See 1 Elrod and Buchele, Kansas Family Law § 2.24(1), p. 100 (noting that an agreement may not be voluntarily entered into if there is evidence of "hiding or misrepresentation of assets"). Duress or fraud in the inducement, on the other hand, is more indicative of a lack of "voluntariness." Elrod summarized the "voluntariness" analysis which a court would undertake and states:

"To determine if the agreement was voluntary, the court will focus on the surrounding facts and circumstances. These include the situation of the parties as compared to each other, such as their respective ages, educational backgrounds, business experience, property, family ties and connections. Additionally the court will look at the circumstances leading up to the execution of the contract and marriage, such as timing of the presentation and execution of the agreement, who drafted the agreement, provisions for the dependent spouse, statements made by the party wanting the agreement, if there was independent legal counsel, and who was present at the execution of the agreement. Absent a showing of undue influence or fraud, the agreement will be upheld." 1 Elrod and Buchele, Kansas Family Law § 2.24, pp. 99-100.

To determine if an agreement was entered into voluntarily, the main thrust of our analysis must focus on "free choice." 1 Elrod and Buchele, Kansas Family Law § 2.24(1), p. 100. See also *In re Adams*, 240 Kan. 315, 320-21, 729 P.2d 1151 (1986) (evaluating whether wife exercised "her own free will" or was under "coercive circumstances" when she signed the marital agreement).

Courts may also consider whether a party had the advice of counsel when determining whether an agreement was entered into voluntarily. See *In re Marriage of Stout*, 261 Mont. 10, 14, 861 P.2d 856 (1993) (in UPAA state, no merit to wife's argument that she did not enter into agreement voluntarily where she had advice of counsel); *Matter of Estate of Lutz*, 563 N.W.2d 90, 98 (N.D. 1997) (advice of counsel is a "significant factual factor" when determining the voluntariness of a premarital agreement under the UPAA and that legal representation is "often the best evidence" that an agreement was signed voluntarily).

Davis argues that she would not have signed the agreement had she known the "fair market value" of GFS. This is mere speculation and is a difficult position to support or attack.

Davis had the advice of legal counsel and signed the agreement on her own "free will." Although she entered the agreement under the stress of attempting to reconcile the marriage, and although she is now challenging the agreement in a separate and collateral action for fraud, the district court did not err in determining that Davis entered into the agreement voluntarily as specified in K.S.A. 23-807(a)(1).

## III. WAS THE AGREEMENT UNCONSCIONABLE?

The district court found that the agreement was not unconscionable as set forth in K.S.A. 23-807(a)(2).

Under the KUPAA, unconscionability is only an issue if there is "nondisclosure of assets." 1 Elrod and Buchele, Kansas Family Law § 2.32, p. 105. As noted earlier, previous law required marital agreements to be "fair and equitable in [their] provisions"; however, under the KUPAA, there is no evaluation of "fairness." 1 Elrod and Buchele, Kansas Family Law § 2.32, p. 105.

The ULA Comment to § 6 of the UPAA, 9B U.L.A. 376-77, sets forth a discussion concerning unconscionability and describes how a court might go about determining if an agreement is conscionable:

"The test of 'unconscionability' is drawn from Section 306 of the Uniform Marriage and Divorce Act (UMDA) [citations omitted.] The following discussion set forth in the Commissioner's Note to Section 306 of the UMDA is equally appropriate here:

'Subsection (b) undergirds the freedom allowed the parties by making clear that the terms of the agreement respecting maintenance and property disposition are binding upon the court unless those terms are found to be unconscionable. The standard of unconscionability is used in commercial law, where its meaning includes protection against one-sidedness, oppression, or unfair surprise [citations omitted], and in contract law [citations omitted]. It has been used in cases respecting divorce settlements or awards. [Citations omitted.] Hence the act does not introduce a novel standard unknown to the law. In the context of negotiations between spouses as to the financial incidents of their marriage, the standard includes protection against overreaching, concealment of assets, and sharp dealing not consistent with the obligations of marital partners to deal fairly with each other.

'In order to determine whether the agreement is unconscionable, the court may look to the economic circumstances of the parties resulting from the agreement, and any other relevant evidence such as the conditions under which the agreement

was made, including the knowledge of the other party. If the court finds the agreement not unconscionable, its terms respecting property division and maintenance may not be altered by the court at the hearing.'"

Although there is some dispute as to the value of GFS, there is no question that Davis received a significant settlement when she signed the marital agreement. There has been no overreaching, oppression, concealment of assets, or unfair surprise. The only question Davis raises concerning the assets is the question concerning the valuation of GFS. Davis was aware of Miller's property interests, as she was married to him for over 20 years. Davis does not assert that Miller hid or concealed any of his property from her. Under the agreement, Davis was provided the means to continue a lifestyle that was commensurate with the lifestyle she led when married to Miller. Davis was able to keep the family home, the power motor boat, $100,000 cash, and a promissory note worth over $1,000,000, among other significant property interests. The district court did not err in finding that the agreement was not unconscionable as described in K.S.A. 23-807(a)(2).

## IV. FAIR AND REASONABLE DISCLOSURE OF MILLER'S PROPERTY

The district court ruled that Miller fairly and reasonably disclosed his assets to Davis in accordance with K.S.A. 23-807(a)(2)(A).

Kansas courts have held that parties disclosing assets do not need to provide an exact dollar amount if there is a general knowledge of the nature and extent of the property involved. 1 Elrod and Buchele, Kansas Family Law § 2.31(3), p. 104. See also *Johntz, Premarital & Nonmarital Contracts* in Practitioner's Guide to Kansas Family Law § 13.10 n.56 (Leben ed. 1997) (noting that Kansas courts have upheld marital agreements where there is general knowledge of the assets of each party but where there may not be actual knowledge of the "exact dollar amount"). Professor Homer Clark, Jr., states in his article on marital contracts:

"[W]here the wife is fully advised of her rights and of the effect upon them of the antenuptial agreement, or where she is experienced in business and accustomed to handling her own financial affairs, the agreement should be upheld even

though the details of the husband's finances are not disclosed to her. In such a case it is sufficient that she knows her husband is rich, even though she does not know the exact extent of his wealth.

. . . .

"[T]he full disclosure may best be made by attaching to the agreement itself a complete and accurate account of each party's property. This is especially important in those cases where the parties wish to make an agreement which might later be considered to provide inadequately for one of them." Clark, *Antenuptial Contracts*, 50 U. Colo. L. Rev. 141, 145-46 (1979).

In *In re Cantrell's Estate*, 154 Kan. 546, 119 P.2d 483 (1941), this court considered an antenuptial contract where the spouse claimed that she had not been fully informed as to her husband's assets and stated:

" 'The mere fact that he may not have disclosed his assets and liabilities in detail to her, will not, in the absence of anything showing fraud or deceit, invalidate the contract, nor will it raise a presumption of fraudulent concealment; . . .' " 154 Kan. at 552 (quoting *Hafer v. Hafer*, 33 Kan. 449, 462-63, 6 Pac. 537 [1885]).

See also *Adams*, 240 Kan. at 320 (holding that there had been adequate disclosure where wife had been "advised generally of the nature and extent" of her husband's assets and knew he was a multimillionaire where wife knew husband more than 20 years before signing agreement); *In re Estate of Broadie*, 208 Kan. 621, 627, 493 P.2d 289 (1972) (holding that the husband did not need to give a detailed disclosure of his property where his wife had a "general knowledge of the nature and extent" of his property interests); *In re Estate of West*, 194 Kan. 736, 745-46, 402 P.2d 117 (1965) (upholding marital agreement where party knew that future husband was wealthy but did not know the extent of his wealth, nor did she know the particular property interests held by him); *In re Estate of Ward*, 178 Kan. 366, Syl. ¶ 1, 371, 285 P.2d 1081 (1955) (holding that husband did not need to "disclose in detail" the "nature, extent and value of his property" to his wife prior to her signing the antenuptial contract where she knew that he was a "man of some means" and that husband had not fraudulently concealed his assets); *In re Estate of Schippel*, 169 Kan. 151, 165, 218 P.2d 192 (1950) (husband does not need to give a detailed disclo-

sure of his assets where his wife has a "general understanding" of the nature and extent of his property).

Other courts have similarly held. See *Hartz v. Hartz*, 248 Md. App. 47, 51, 234 A.2d 865 (1967) (upholding premarital agreement where plaintiff knew "more or less" what property her fiance had and that he was very wealthy although she did not know in detail his financial position); *Schutterle v. Schutterle*, 260 N.W.2d 341, 349 (S.D. 1977) (upholding postnuptial agreement where wife had "sufficient knowledge of the nature and extent" of husband's property); *In re Borton's Estate*, 393 P.2d 808, 814 (Wyo. 1964) (upholding premarital agreement where party knew that fiance had a "goodly amount in the bank" and that he was "well to do" although she did not know exactly how much wealth he had until after he died).

Furthermore, disclosure of assets in a premarital context is much different than disclosure of assets in a mid-marital context, especially in the present case where Davis and Miller were married for more than 20 years. See 50 U. Colo. L. Rev. 152 n.51 (noting that changed circumstances after a marriage may put the parties in a different position from the time they may have signed a *prenuptial* agreement several years prior).

Miller divulged the nature of his assets to Davis and did not hide or conceal any assets from her. Davis' sole contention is that she was misled as to the *value* of one of the assets, GFS. There has been no allegation that Miller has hidden any assets or failed to divulge the existence of any particular assets. GFS was valued on the December 31 financial statement based upon its "book value." "Book value" of a share of stock is the corporation's assets minus its liabilities divided by the number of shares outstanding. 1 O'Neal's Close Corporations § 7.27 (1996 Supp.). "Book value" gives a "snapshot" of the value of a corporation and is not intended to represent the fair market value of a corporation.

Davis now alleges that she was led to believe that the "book value" and the "fair market value" were the same and asserts that if she had known that the fair market value was significantly greater than the book value, she would have never signed the agreement. It will never be known whether Davis would have or would not

have signed the settlement agreement had she been given a different figure estimating the fair market value of GFS. We do know that Davis was fairly appraised of the property interests held by Miller and, moreover, due to the lengthy marriage, she was in a position of knowledge that is far superior to that of a young bride signing an agreement *before* the marriage. The district court did not err in finding that Miller fairly and reasonably disclosed his property to Davis pursuant to K.S.A. 23-807(a)(2)(A).

## V. WAIVER OF RIGHT TO DISCLOSURE OF MILLER'S PROPERTY

The district court ruled that Davis waived her right to any disclosure of Miller's property in the settlement agreement as set forth in K.S.A. 23-807(a)(2)(B).

The pertinent portion of the postnuptial agreement reads:

"3. Waiver of additional financial information. The parties hereto each voluntarily and expressly waive any right to disclosure of the property, financial position or obligations of the other *beyond the disclosures provided* herein and by the attachments hereto." (Emphasis added.)

Davis argues that although paragraph 3 controls the waiver of release of any *additional* financial information, paragraph 2 controls the disclosure of previous or attached financial information. Paragraph 2 reads:

"2. Financial information disclosure. 'Husband' has made complete disclosure to 'Wife' of his financial situation through personal and business records and through statements made at a conference of attorneys and accountants in which a transcribed record was taken on December 1, 1994."

We interpret the contract to be a waiver of any *future* disclosures and not to apply to a waiver of any and all disclosures made in the *past*. The district court incorrectly ruled that Davis had waived her right to disclosure as is meant by K.S.A. 23-807(a)(2)(B). Because we have held, however, that Miller adequately disclosed his property interests to Davis, this issue is moot and does not affect this court's decision.

## VI. ADEQUATE KNOWLEDGE

The district court ruled that Davis had adequate knowledge of Miller's property as is contemplated by K.S.A. 23-807(a)(2)(C).

Davis' knowledge of Miller's property interests is the flip-side of K.S.A. 23-807(a)(2)(A), which we discussed earlier. Davis and Miller were married for over 20 years and Davis was given a financial statement with all of the couple's property listed. Davis was represented by counsel and had the ability to discover more specific information about Miller's holdings but chose not to. Davis was given the book value of GFS, which indicated that the company was worth a substantial amount of money. The financial statement indicated that GFS and other holdings were being valued on a book value basis rather than a fair market value. Davis did not inquire as to the fair market value of GFS or make any inquiries to financial institutions that were doing business with Miller at the time so as to independently determine his financial status. Davis chose not to make further inquiry as to the fair market value or do any further investigation on other methods of valuating GFS. All of the evidence that Davis is now using to establish her claim of fraud and breach of warranty could have been discovered by Davis and her counsel before signing the postnuptial agreement.

The district court did not err in ruling that Davis had an adequate knowledge of Miller's property as required by K.S.A. 23-807(a)(2)(C).

## VII. INDEMNITY PROVISION

The district court ruled that the postnuptial agreement allowed Miller to request attorney fees pursuant to the indemnity provision found in paragraph 28.

Paragraph 28 of the postnuptial agreement is at issue here. Paragraph 28 reads:

"28. Indemnification. Each party shall refrain from attempting to obtain any court order or decision which is contrary to the terms of this Agreement or which attempts to enlarge or reduce the amounts to be received by either party in the event of a divorce, separate maintenance or annulment, or upon the death of either. Each party hereby indemnifies the other for any loss, cost or expense (including attorney fees) the other party incurs for his/her breach in *seeking to obtain judicial modification of this Agreement.* This indemnification on behalf of each party shall be binding upon and include any claims, demands, or litigation filed by personal representatives or heirs of either party." (Emphasis added.)

Davis argues that she is not attempting to modify the agreement but that she is maintaining this action as a separate independent action for fraud and that she is otherwise affirming the provisions of the agreement; therefore, the indemnification paragraph does not apply. Davis asserts that this action merely seeks damages for fraud and breach of contract and is not one seeking a judicial modification of the postnuptial agreement. The district court did not err in holding that paragraph 28 applies in this case.

## VIII. AWARDING ATTORNEY FEES

Davis argues that the district court erred in awarding attorney fees to Miller.

A district court's determination of the reasonableness of claimed attorney fees is reviewed on appeal under an abuse of discretion standard of review. *Sheila A. v. Whiteman*, 259 Kan. 549, 561, 913 P.2d 181 (1996). Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable. *State v. Davidson*, 264 Kan. 44, 56, 954 P.2d 702 (1998); *Saucedo v. Winger*, 252 Kan. 718, 730-32, 850 P.2d 908 (1993).

The district court awarded "reasonable attorneys fees, costs and expenses" in the amount of $315,107.04. Fees which are not supported by "meticulous, contemporaneous time records" that show the specific tasks being billed should not be allowed. *Case v. Unified School Dist. No. 233, Johnson County*, 157 F.3d 1243, 1250 (10th Cir. 1998).

Davis' expert testified before the trial court that the attorney fees were unreasonable. Davis also asserts that the district court ignored (1) charged expenses such as overhead; (2) inadequate or undetailed billing; (3) multiple attorney billing; and (4) conference billing where the records do not reflect the matters discussed. Davis does not support this argument with any references to the record, but merely asserts that her expert testified to such before the district court and that alone should be enough to reverse the district court's ruling on attorney fees.

Davis' expert does not challenge the hourly fee of the three lawyers employed by Miller. In fact, all three charged less per hour

than Davis' expert's hourly fee. All the attorneys and accountants are among the best in their professions.

The district court did not allow the fee of Thomas L. Steele on the basis that he was an employee of GFS. The district court held in pertinent part:

> "I do not find:
> "1. There was background research.
> "2. Unnecessary duplication of services.
> "3. Unnecessary consultation with other attorneys.
> "4. Unwarranted conferences.
> "5. Unwarranted 'Westlaw' research.
> "6. Any dual billing where billing is for training or supervision of another attorney.
> "7. Any expenses charged as not relevant in the community.
> "8. That computer billing did not describe the work done.
> "I find the attorneys fee were:
> "A. Reasonable as to time and labor required, the novelty and difficulty of the questions involved and the skill requisite to perform the legal service properly.
> "B. The likelihood that this engagement would preclude other engagement.
> "C. In the range of fees customarily charge[d] for similar legal services.
> "D. Reasonable for the amount involved and the results obtained.
> "E. The time limitations imposed by the court.
> "F. The nature and length of the professional relationships with the client.
> "G. The experience, reputation and ability of the lawyers.
> "H. The fee was fixed at an hourly rate.
> "Thomas Steele:
> "Mr. Steele performed valuable services in this case. Mr. Steele is employed by General Financial Services which has paid him a salary. General Financial Services is owned entirely by the defendant. General Financial Services has not billed defendant. There is no provision proved for Mr. Steele to be paid anything other than his salary. The Court denies this application.
> "Defendants fees are allowed except for Thomas Steele. Counsel will prepare an appropriate order."

Much of the fee allowed was deemed reasonable by Davis' expert. Davis' expert would have reduced Thomas Steele's fee to zero, which the district court did. The recommendation as to the other two lawyers was to reduce their fees to $150,482.71 and $47,487.50.

Davis has several complaints, one of which is that Steele and sometimes both other lawyers appeared for depositions. Steele is not being paid, so that reduces the issue to two lawyers. Davis had two lawyers at most of the depositions, which leaves her in a poor position to complain.

Miller argues the pending lawsuit caused him problems with his financial institutions, and he was in a position that he had to make a maximum effort to win the lawsuit as soon as possible. He was thus required to hire the best lawyers and accountants available and to have his case take priority over their other work.

Davis also argues that some of the paralegal work was clerical in nature and should have been considered as part of the attorneys' overhead. Our view of the large record before us reveals that it would take a line-by-line review of records that are not descriptive enough for this court (or the district court) to separate paralegal work from clerical work to try and separate the two.

We have previously said in *Link, Inc. v. City of Hays*, 268 Kan. 372, 381-83, 997 P.2d 697 (2000):

"The amount of an attorney fee award is within the sound discretion of the district court and will not be disturbed on appeal absent a showing that the district court abused that discretion. *Sheila A. v. Whiteman*, 259 Kan. 549, Syl. ¶ 9, 913 P.2d 181 (1996).

. . . .

"The City's argument lacks merit. While the district court is considered an expert on the issue of attorney fees, *City of Wichita v. BG Products Inc.*, 252 Kan. 367, 372-73, 845 P.2d 649 (1993), the City cites no case placing a *duty* on the district court to disregard the evidence and use its 'expertise' as a controlling element in an award determination. In *BG Products* we said: " 'The trial court itself is an expert in the area of attorneys' fees and *can* draw on and apply its own knowledge and expertise in evaluating their worth.' " (Emphasis added.) 252 Kan. at 372 (quoting *Buchanan v. Employers Mutual Liberty Ins. Co.*, 201 Kan. 666, Syl. ¶ 9, 443 P.2d 681 [1968].) The district court observed that Link

'introduced four exhibits. Exhibits 1 through 3 consist of time records, a fee agreement, and a co-counsel agreement between Kansas Advocacy and Protective Services, Inc. and David Calvert. The fourth exhibit consists of a looseleaf binder containing a thorough brief of the issue by Mr. Scott, including extensive references to pertinent case law and other authority. It is also notable that David Calvert was assisted at trial by Jim Germer, an attorney for K.A.P.S., who has not requested a fee.'

By approving the fee, the district court has inferentially applied its own view as to reasonableness. Such an inference is inherent in the award. The City must show that no reasonable person would agree with the district court's decision. This, the City cannot do.

"In *BG Products*, we upheld an attorney fee of $300 per hour for 410 hours. This award of $123,000 was based on hourly fees alone; costs were also awarded. *BG Products* was a condemnation case. We noted the testimony that the attorney involved was an acknowledged expert in the field of eminent domain and had obtained outstanding results for his client. 252 Kan. at 375. As in *BG Products*, there was testimony here that Link's attorney is a recognized expert.

"*BG Products* also held that the eight factors set forth in Rule 1.5 (1999 Kan. Ct. R. Annot. 312) of the Kansas Rules of Professional Conduct should be considered in deciding the reasonableness of an attorney fee. 252 Kan. at 374. Scott testified on the Rule 1.5 factors.

"The district court relied on competent evidence. Appellate courts are also experts on the reasonableness of attorney fees. However, we do not substitute our judgment for that of the district court on the amount of the fee unless 'in the interest of justice' we disagree with the district court. *Buchanan*, 201 Kan. 666, Syl. ¶¶ 9-11. The interests of justice do not compel us to disagree with the district court. We find no abuse of discretion here."

In the case at bar, the district judge carefully examined all the factors suggested in *Link, Inc.* While at first glance the fee seems excessive, our examination of the extensive record leads us to conclude the interests of justice does not require a reduction of the fee.

Davis has failed to show that the district court abused its discretion in awarding attorney fees in this matter and in the amount awarded.

Affirmed.