(223 P.3d 311)
No. 100,637

MERCY REGIONAL HEALTH CENTER, INC., *Appellee*, v. JENNIFER L. BRINEGAR and JASON BRINEGAR, *Appellants*.

Opinion filed January 22, 2010.

*Jason E. Brinegar* and *Brian Carroll*, of Galloway, Wiegers & Brinegar, P.A., of Marysville, for the appellants.

*Amy S. Lemley*, of Foulston Siefkin LLP, of Wichita, for the appellee.

Before MARQUARDT, P.J., PIERRON, J., and BUKATY, S.J.

BUKATY, J.: Jason Brinegar (Brinegar) appeals the trial court's award of attorney fees against him in favor of Mercy Regional Health Center, Inc. (Mercy). We affirm.

This case began in October 2006, as a debt collection proceeding under Chapter 61 of the Kansas Code of Civil Procedure. Mercy sued Jason and Jennifer Brinegar to collect for services rendered in connection with a minor surgical procedure that was performed on their daughter at Mercy. Brinegar, who is an attorney, filed an answer on behalf of his wife and himself disputing the debt. He included with his answer a counterclaim on behalf of Jennifer and himself alleging Mercy violated the Kansas Consumer Protection Act (KCPA), K.S.A. 50-623 *et seq.*, and the Fair Debt Collections Practices Act (FDCPA), 15 U.S.C. § 1692 (2006) *et seq.* Eventually, the Brinegars voluntarily dismissed their KCPA and FDCPA claims. Then just prior to the scheduled trial, they agreed to a judgment against them for $1,230.57, the amount of the original hospital bill. Mercy sought to recover attorney fees against Brinegar

only, and the parties went to trial on that sole issue. After holding a lengthy evidentiary hearing during which over 30 exhibits were admitted into evidence, the trial court prepared and filed a detailed journal entry awarding a judgment for attorney fees to Mercy under K.S.A. 50-634(e) and K.S.A. 60-211 against Brinegar. He appeals from that judgment.

*Essential Facts*

One of Brinegar's arguments that we address in this appeal requires a scrutiny of his intent at the time he filed the counterclaim with the court. Consequently, a somewhat detailed recitation of the facts leading up to and following that filing is necessary for an understanding of the issues.

On October 20, 2005, the Brinegars' daughter underwent a scheduled minor surgery at Mercy. Jennifer took her daughter to Mercy for the surgery and signed the admissions documents. The admission documents contained the following statement relating to the agreement to pay for services:

"**10. AGREEMENT TO PAY FOR SERVICES AND ASSIGNMENT OF INSURANCE BENEFITS.** In consideration of the admission, care, and treatment provided to the patient, the undersigned . . . agrees to pay Mercy Regional Health Center all charges for services rendered in accordance with its regular rates on this date. . . .

"I hereby assign to Mercy Regional Health Center any and all medical benefits payable from any policy of insurance insuring the patient or person responsible for the patient's care . . . to be paid directly to Mercy to be applied to the charges for services rendered. I understand I am responsible for co-insurance payments, deductibles and/or any remaining balance."

The Brinegar family had a health insurance policy through Blue Cross Blue Shield of Kansas (BCBS). The relevant portion of the Brinegars' policy relating to the allowable charges for covered services from a contracting provider stated as follows:

"**A. Contracting Providers of Blue Cross and Blue Shield of Kansas or another entity on behalf of Blue Cross and Blue Shield of Kansas or another entity on behalf of Blue Cross and Blue Shield of Kansas for other than Prescription Drugs or Sleep Studies.**

"The Contracting Provider Agreement between the provider and the Company or the provider and the other entity sets out the method the Company or other entity will use to determine allowable charges for covered services. Contracting

Providers have agreed to accept the Company's or other entity's determination of Your benefits as payment in full for covered services, except that You are responsible for payment of: Deductible, Coinsurance, Copayment/Copay amounts, shared payment amounts, non-covered services, private room charges in excess of the allowable amount stated in Your Certificate, and amounts in excess of any other benefit limitations of Your Certificate."

The total amount of the bill from Mercy for the services provided to the Brinegars' daughter came to $2,351.00. Apparently, this bill would have been the same amount for the particular services received, regardless of whether the patient was covered by Medicaid, private insurance, or was uninsured.

Mercy submitted the bill to BCBS. Based on its agreement with BCBS, Mercy was required to write off $1,120.43 of the charges. The remaining amount of $1,230.57 applied towards the Brinegars' deductible and became the Brinegars' responsibility to pay.

On November 21, 2005, Mercy sent the Brinegars a bill for this balance of $1,230.57. The following month, Mercy sent a second bill to the Brinegars. Mercy later received a handwritten note from Brinegar. In the note, Brinegar wrote as follows:

"If you really want me to pay this bill you are going to have to do much better than simply send such a general & undetailed statement. Further, I demand to be informed of the amount Medicaid pays for this procedure/service.

"In the alternative I will send you $600.00 to settle this account in full."

Upon receiving Brinegar's letter, a Mercy account representative checked Medicaid eligibility. Apparently, the Brinegars' daughter did not qualify for Medicaid coverage. The account representative called Brinegar and left a number with his receptionist.

Between January and April 2006, Mercy sent several notices to the Brinegars for the amount owing. At one point during this time, Brinegar called an account representative with Mercy and was very demeaning and rude. He demanded an itemized statement, demanded to know what Medicaid paid, and stated he was only going to pay Medicaid's amount even though his daughter did not qualify for Medicaid. When the representative stated she did not know and did not have that information without submitting the bill to Medicaid, Brinegar called her a liar. He also stated that Mercy

would have to sue him to collect and that he had been down that road before.

In April 2006, Mercy turned over the Brinegars' account to Kansas Counselors, Inc. (KCI), for collections. Brinegar then responded in a letter to KCI in which he disputed the debt and requested a verification of it. Brinegar is an attorney with the firm Galloway, Wiegers, and Heeney, P.A. He sent the letter in his capacity as his and his wife's attorney. At the end of his letter, he wrote: "[I]f your client insists on pursuing this matter by filing suit, we will demand depositions of ALL attending physicians as well as an administrator."

KCI forwarded Brinegar's letter to Mercy, and the matter was referred to Grant Bannister, an attorney in Manhattan, Kansas. Bannister sent Brinegar a letter, along with an itemized hospital bill from Mercy, a remittance from BCBS, and patient claim details from BCBS. In the letter, Bannister told Brinegar that Mercy had declined his offer of $600.

In a May 15, 2006, letter to Bannister, Brinegar wrote that he had not received verification of the hospital bill and that Bannister's letters had not been responsive to his requests for information. Brinegar further wrote:

"You can pass along to your client that in the event that suit is filed, or even if the claim is reported to a credit bureau that they will be in for protracted litigation. It will be necessary to procure the depositions of the medical professionals involved in the procedure as well as administrative personnel.

"In the alternative, I have repeatedly offered to settle the matter. However, your client appears unresponsive to such. Settlement would only make sense as a collection agency will take forty percent. Why not simply settle this matter for sixty percent and ensure the collection without the effort and expense of the litigation described above."

Mercy authorized the filing of suit against the Brinegars, and it sent the case to attorney Kurt Holmes. Before filing suit, Holmes sent a demand letter to the Brinegars. Brinegar then sent a letter to Holmes disputing the debt and demanding verification of the hospital bill. In addition, Brinegar invited Mercy to file suit against him so that he could pursue his FDCPA counterclaim:

"I have in the past made two offers to settle this account, both of which have been ignored. I have concluded that your client would rather litigate the matter than settle. Therefore, please file suit to move this matter along and then I can move forward with my counterclaim for failure to comply with the FDCPA and set up the Dr. and administrator for a deposition. If your client is amenable to settlement, please review my offer of 60% or $738.34 made on May 15, 2006."

On September 21, 2006, Holmes responded to Brinegar's letter and sent him a verification of the debt. Holmes wrote that he had forwarded Brinegar's settlement offer to Mercy and would advise him as to Mercy's response. The verification was signed by Mercy's business office manager but was not notarized.

In October 2006, Mercy sued the Brinegars for $1,230.57, plus interest and costs, in a Chapter 61 debt collection proceeding. The Brinegars filed an answer and counterclaim to Mercy's petition. The defenses included in the answer were waiver, failure to mitigate, accord and satisfaction, estoppel, and laches. In addition, the answer alleged that Mercy had failed to adequately and competently perform services as promised and that the Brinegars had received no value from the services provided by Mercy. In their counterclaim, the Brinegars alleged that Mercy had violated the KCPA and FDCPA and asked for an award of actual and statutory damages, costs, and attorney fees. In addition, the Brinegars requested a jury trial. Brinegar, in his capacity as an attorney, signed the answer and counterclaim.

On October 31, 2006, Brinegar faxed the answer and counterclaim from his law firm to Holmes. "GAME ON!" was written in the comments section on the fax cover sheet.

On November 15, 2006, attorney Matthew Hesse wrote Brinegar and offered to settle the account for $1,000. Hesse was in-house counsel for Via Christi Health System, of which Mercy was an affiliate member. In his letter, Hesse stated that Mercy's decision not to accept his earlier offers would not rise to the level of a KCPA violation. Hesse further stated: "You are probably aware that the [KCPA] cuts both ways on attorney's fees. See, K.S.A. 50-634. The prevailing party can request reimbursement of fees. Before this enters the 'protracted litigation stage,' it behooves both parties to discuss this matter."

In response to Hesse's letter, Brinegar left Hesse a voicemail in which he stated that the "$1,000" offer was unacceptable and "let's just have some fun with it."

At that point, Hesse hired Jay Fowler, a partner at Foulston Siefkin, to defend the counterclaims and prosecute the debt collection. Hesse had previously hired attorney Curt Loub to enter an appearance in the case and to request a 10-day extension to respond to the Brinegars' counterclaim. Fowler filed a reply to the Brinegars' counterclaim and maintained that Mercy was entitled to attorney fees and expenses under K.S.A. 60-211, K.S.A. 50-634 of the KCPA, and 15 U.S.C. § 1692k(a)(3) (2006) of the FDCPA.

Brinegar's law firm had an associate named Elizabeth Hiltgen. She had signed several documents on behalf of the Brinegars that were related to discovery and filed with the court. After filing answers to the Brinegars' interrogatories, Fowler wrote to Hiltgen and stated that there was no basis for either a KCPA claim or an FDCPA claim and reminded her that the Brinegars could end up being responsible for Mercy's attorney fees. Fowler urged Hiltgen to read a 2001 annotation article entitled "What Constitutes 'Debt Collector' for Purposes of Fair Debt Collection Practices Act" at 173 A.L.R. Fed. 223. Finally, Fowler offered to settle the case for $1,230.57, plus the $53 filing fee.

Hiltgen responded to Fowler's letter saying she would be filing an amended petition to include Holmes and KCI in order to preserve the FDCPA claim. She reminded Fowler that he had yet to provide her with answers to production for documents. Further, she told Fowler that his offer to settle the case was denied and that she would need to depose the treating physician, admission coordinator, and billing clerk at Mercy.

Fowler wrote back to Hiltgen and enclosed responses to the Brinegars' requests for production. Moreover, Fowler pointed out that based on the promise to pay and the Brinegars' contract with BCBS, there was no viable KCPA claim. Finally, on the matter of depositions, Fowler stated that "K.S.A. 61-3105 limits the use of depositions in Chapter 61 cases to only those instances where the deposition is necessary to preserve testimony for trial and the use

of the deposition as appropriate pursuant to the criteria set out in K.S.A. 61-3105(b).''

Hiltgen then communicated an offer to settle the case for $850 to Fowler. Mercy declined the offer. In a letter dated January 18, 2007, Fowler again explained the reasonableness of Mercy's charges, pointed out the risk to the Brinegars for an adverse judgment for attorney fees and costs, and again offered to settle for $1,230.57, the amount of the original claim, plus the $53 filing fee.

In January 2007, Hiltgen, on behalf of the Brinegars, moved for leave to amend their counterclaim to add defendants KCI and Holmes and to "omit" the FDCPA counterclaim against Mercy. The trial court granted the motion to withdraw the counterclaim against Mercy but denied the motion to amend it. The Brinegars appealed that decision. Mercy objected to the notice of appeal and argued that a ruling on a motion to amend is not appealable in a Chapter 61 proceeding. Brinegar eventually withdrew his notice of appeal.

In January 2008, attorney William O'Keefe entered an appearance for the Brinegars and soon thereafter notified the trial court that the Brinegars were dropping the demand for a jury trial.

In February 2008, O'Keefe, on behalf of the Brinegars, moved to amend the pleadings. The motion stated that the Brinegars would drop all counterclaims against Mercy and stipulate that they owed $1,230.57 to Mercy. Moreover, the Brinegars requested to change their defenses of accord and satisfaction, estoppel, laches, and waiver to the defense of clean hands. The trial court granted the motion to amend the pleadings and entered judgment in favor of Mercy for $1,230.57, plus prejudgment interest at the rate of 10%.

The case then went to trial on the remaining issue of Mercy's request for attorney fees under K.S.A. 60-211, K.S.A. 50-634, and 15 U.S.C. § 1692k(a)(3). Mercy sought attorney fees in the amount of $17,095.95, plus costs, including statutory witness fees and mileage. Amy Lemley, of Foulston Siefkin, represented Mercy during the trial. At the beginning of trial, Lemley reiterated that the attorney fee request was against Jason Brinegar, and the trial court excused Jennifer Brinegar from attending the trial.

Shortly thereafter the trial court issued its journal entry granting judgment in favor of Mercy against the Brinegars, jointly and severally, for $1,230.57, plus interest and costs. Additionally, it entered judgment against Jason Brinegar alone in the amount of $8,318.50 for attorney fees under K.S.A. 60-211 and K.S.A. 50-634. The court determined that Mercy was not entitled to attorney fees under 15 U.S.C. § 1692k(a)(3) of the FDCPA.

Brinegar moved for a new trial or to alter or amend the judgment under K.S.A. 60-259, which was denied.

### Attorney Fees Under K.S.A. 60-211

Brinegar offers two reasons why the trial court erred in awarding attorney fees under K.S.A. 60-211: (1) The trial court failed to identify any pleading that violated K.S.A. 60-211(c); and (2) there was no factual basis to support a determination that any pleading was done for an improper purpose.

A court may not award attorney fees absent statutory authority or an agreement by the parties. *Brennan v. Kunzle*, 37 Kan. App. 2d 365, 392-93, 154 P.3d 1094, *rev. denied* 284 Kan. 945 (2007). Whether the requisite authority exists is a question of law over which appellate review is unlimited. *Idbeis v. Wichita Surgical Specialists*, 285 Kan. 485, 490, 173 P.3d 642 (2007).

Brinegar's arguments on this issue require interpretation of K.S.A. 60-211. This interpretation of a statute also presents a question of law over which appellate courts have unlimited review. *Double M Constr. v. Kansas Corporation Comm'n*, 288 Kan. 268, 271, 202 P.3d 7 (2009). The most fundamental rule of statutory construction is that the intent of the legislature governs if that intent can be ascertained. *Hall v. Dillon Companies, Inc.*, 286 Kan. 777, 785, 189 P.3d 508 (2008). An appellate court's first task is to " 'ascertain the legislature's intent through the statutory language it employs, giving ordinary words their ordinary meaning.' [Citation omitted.]" *State v. Gracey*, 288 Kan. 252, 257, 200 P.3d 1275 (2009).

In addition to the statutory interpretation questions involved here, Brinegar's arguments require an examination of the findings of fact made by the trial court. The court issued a lengthy journal

entry containing those findings and its legal conclusions. We review the court's findings of fact to determine if they are supported by substantial competent evidence and are sufficient to support the trial court's conclusions of law. Substantial evidence is such legal and relevant evidence as a reasonable person might regard as sufficient to support a conclusion. *Hodges v. Johnson*, 288 Kan. 56, 65, 199 P.3d 1251 (2009). An appellate court has unlimited review of the trial court's conclusions of law. *Owen Lumber Co. v. Chartrand*, 283 Kan. 911, 915-16, 157 P.3d 1109 (2007).

K.S.A. 60-211 provides as follows:

"(a) Every pleading, motion and other paper provided for by this article of a party represented by an attorney shall be signed by at least one attorney of record in the attorney's individual name, and the attorney's address and telephone number shall be stated. A pleading, motion or other paper provided for by this article of a party who is not represented by an attorney shall be signed by the party and shall state the party's address. Except when otherwise specifically provided by rule or statute, pleadings need not be verified or accompanied by an affidavit.

"(b) The signature of a person constitutes a certificate by the person that the person has read the pleading, motion or other paper and that to the best of the person's knowledge, information and belief formed after an inquiry reasonable under the circumstances:

(1) It is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(2) the claims, defenses and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification or reversal of existing law or the establishment of new law;

(3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

. . . .

"(c) If a pleading, motion or other paper provided for by this article is not signed it shall be stricken unless it is signed promptly after the omission is called to the attention of the pleader or movant. *If a pleading, motion or other paper provided for by this article is signed in violation of this section, the court, upon motion or upon its own initiative upon notice and after opportunity to be heard, shall impose upon the person who signed it or a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion or other paper, including reasonable attorney fees.* A motion for sanctions under this section may be served and filed at any time during the pen-

dency of the action but not later than 10 days after the entry of judgment." (Emphasis added.)

We first address Brinegar's argument that the trial court failed to identify any pleading that violated K.S.A. 60-211. The argument lacks any merit. It is abundantly clear from a reading of the trial court's journal entry of judgment that it was the filing of the counterclaim and subsequent prosecution of it that brought on the sanctions. The decision mentions no other pleading that caught the court's ire.

In conjunction with the above argument, Brinegar contends there is no statutory or case law authority that supports a finding that a pleading that was proper at the time it was filed can later result in sanctions under K.S.A. 60-211(c) because of conduct of the signer *after* the filing. We agree.

The plain language of K.S.A. 60-211(c) allows a trial court to impose appropriate sanctions, which may include attorney fees, against a party or an attorney for *signing* pleadings, motions, and other papers filed with the court in violation of the statute. Under K.S.A. 60-211(c), it is this act of signing an improper pleading, motion, or other paper filed with the court that subjects the offender to sanctions. In determining whether sanctions should be awarded under this section, a court must focus its inquiry on whether the pleadings, motions, or other papers were in violation of the statute *when* they were signed and filed with the court. Federal court case law interpreting Rule 11 of the Federal Rules of Civil Procedure, upon which K.S.A. 60-211 is modeled, supports this interpretation. See *Jones v. International Riding Helmets, Ltd.*, 49 F.3d 692, 695 (11th Cir. 1995) (In considering whether to award sanctions under Rule 11, the court's inquiry focuses only on the merits of the pleading gleaned from the facts and law known or available to the attorney *at the time of filing*.); *Souran v. Travelers Ins. Co.*, 982 F.2d 1497, 1507 n.12 (11th Cir. 1993) (quoting Fed. R. Civ. Proc. 11, Advisory Committee Note) (" 'The court is expected to avoid using the wisdom of hindsight and should test the signer's conduct by inquiring what was reasonable to believe at the time the pleading, motion, or other paper was submitted.' "); *Jack-*

*son v. Law Firm of O'Hara, Ruberg, et al.*, 875 F.2d 1224, 1229 (6th Cir. 1989).

We note that Rule 11 of the Federal Rules of Civil Procedure was amended in 1993 to change the triggering action for sanctions from "signing" to *"presenting* to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it." Those amendments, however, are irrelevant to the issues here since K.S.A. 60-211 has no such language.

To the extent then that the trial court here may have imposed sanctions on Brinegar under K.S.A. 60-211 for his conduct in *prosecuting* his counterclaim after he filed it, the court applied a wrong standard. The court appears to have done so since it discusses in detail the fact Brinegar continued to pursue his counterclaims for violation of the KCPA up until just before the scheduled trial. It appears the court may have imposed sanctions as a result of both the signing and the prosecution of the counterclaim.

However, if the trial court reached the right result in determining that attorney fees are appropriate here under K.S.A. 60-211(c), we will uphold the decision even though the trial court assigned an erroneous reason or reasons for its decision. The reason given by the trial court for its ruling is immaterial if the result was correct. *City of Arkansas City v. Bruton*, 284 Kan. 815, 848-49, 166 P.3d 992 (2007).

Despite the trial court's repeated language critical of the way Brinegar prosecuted his counterclaim, the opinion also contains language indicating the court clearly understood the focus must be on the *signing* of the pleading before sanctions are authorized under K.S.A. 60-211. In discussing Brinegar's counterclaim for KCPA violations, the court stated:

"Based on the plain language in [K.S.A. 60-211](c), sanctions, of at least some type, are mandatory when a pleading is signed in violation of the statute and/or an attorney violated the statue willfully, knowingly, and in bad faith. [Citation omitted.] In making that determination, the court should consider whether the evidence indicates that a claim asserted was without reasonable basis in fact and the claim was not asserted in good faith. [Citation omitted.] Trial courts retain discretion as to the type and degree of sanctions appropriate and are subject to and abuse of discretion standard. [Citations omitted.]"

Then in referring again to the counterclaim for violation of the KCPA, the trial court appears to have applied this proper standard in rendering its finding that Brinegar brought the claim for an improper purpose when it stated:

"The only logical justification in either presenting it or maintaining it was to attempt to leverage defendant's position against the original debt claim. While such ploys are unfortunately not always uncommon, they are an abuse of the legal system and a serious abuse when they are maintained for an extended period of time. Mr. Brinegar's gamble seriously raised the stakes of this otherwise straight forward debt case."

The uncontroverted evidence presented to the trial court amply supports this finding that Brinegar brought his counterclaim for an improper purpose. First, there was the rude and demeaning attitude he displayed with employees and agents of Mercy who had contacted him about the bill. This is not unusual or sanctionable by itself. But then there were the letters from Brinegar threatening "protracted litigation" and threatening to depose hospital personnel so as to disrupt the functioning of the hospital, as well as the "GAME ON!" challenge to Mercy. Combined, all these facts provide ample evidence the counterclaims were brought for the improper purpose of economically intimidating Mercy and pressuring it to compromise its billing or face significant legal costs. As set forth previously, a pleading, motion, or paper is in violation of K.S.A. 60-211(b)(1) if it is "presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation." The evidence here suggests that is exactly what Brinegar intended and, in fact, accomplished.

The trial court awarded Mercy the judgment for attorney fees under both K.S.A. 60-211 and the KCPA, more specifically K.S.A. 50-634. It then ordered the two awards to run concurrent with each other. Since we have concluded that the award was proper under K.S.A. 60-211, Brinegar's argument that the court erred in ordering fees under K.S.A. 50-634 is now moot. We need not consider it.

*Factors To Be Considered in Determining the Amount of Attorney Fees*

Brinegar next contends that the trial court failed to properly consider the relevant factors for determining attorney fees. The argument has no merit.

KRPC 1.5(a) (2009 Kan. Ct. R. Annot. 460) of the Kansas Rules of Professional Conduct outlines the eight relevant factors to be considered in determining the reasonableness of an attorney fee. The trial judge specifically identified and then considered six of those factors that he thought pertained to the facts in this case. The court also identified other factors it considered and then outlined evidence it thought pertained to those factors.

Further, we note the trial court apparently attempted to award attorney fees only for the time Mercy spent defending Brinegar's claim under the KCPA and not award attorney fees for time attributed solely to defense of the FDCPA claim. However, the court awarded attorney fees for time that could not be attributable to a specific claim because the claims were so intermingled in the litigation that a separation of the time attributable to each could not be accomplished. This is certainly appropriate. See *DeSpiegelaere v. Killion*, 24 Kan. App. 2d 542, Syl. ¶ 2, 947 P.2d 1039 (1997).

Brinegar further argues the trial court erroneously awarded attorney fees to Mercy for time spent litigating the attorney fees award. However, our Supreme Court stated in *Moore v. St. Paul Fire Mercury Ins. Co.*, 269 Kan. 272, Syl. ¶ 2, 3 P.3d 81 (2000):

"The primary purpose of the Kansas fee-shifting statute is to benefit the insured. Fees incurred litigating the amount of attorney fees to be awarded are recoverable under K.S.A. 40-256. The fact that the award of such fees ultimately rests in the insured's attorney being paid to litigate the fees is collateral and incidental to the primary purpose of indemnifying an insured for the cost of counsel in an action against the insurer."

Although we are dealing with different attorney fees statutes here, the rationale expressed in *Moore* is applicable. While the award of attorney fees in this case results in Mercy's attorneys being paid to litigate the attorney fees issue, it is incidental to the primary purpose of the fee sanction which is to indemnify Mercy for a

reasonable amount of attorney fees it incurred in defending against Brinegar's filing of a counterclaim for an improper purpose.

Importantly, Mercy sought more than twice the amount of attorney fees than the trial court awarded. In reducing the judgment, the court very adequately set forth its reasons. The trial court is an expert regarding the award of attorney fees and can apply its own expertise in determining the reasonable value of those fees. An appellate court is also an expert on the reasonableness of attorney fees. However, an appellate court does not substitute its judgment for that of the district court on the amount of the attorney fees award unless in the interest of justice the appellate court disagrees with the trial court. *Davis v. Miller*, 269 Kan. 732, 750-51, 7 P.3d 1223 (2000). We find no basis to disagree in this case.

### *Brinegar's Motion to Compel Discovery*

Brinegar argues the trial court erred in denying or failing to rule on his motion to compel discovery. The Brinegars moved to compel Mercy to respond to one of their interrogatories requesting information relative to the Medicaid reimbursement rate for the procedures performed on the Brinegars' daughter. Apparently, Mercy had responded to the interrogatory by stating that the information was not relevant and was not likely to lead to discoverable information. The record before us contains no order in which the trial court specifically ruled on this motion.

However, even had the trial court denied the motion, that denial would not be reversible error under the facts before us. In this appeal, Brinegar is requesting only that we reverse the award of attorney fees entered by the trial court. We fail to see how the specific amount that Medicaid would have paid for services would have affected that award. At trial, Brinegar was able to present his argument to the court that he pursued his KCPA claim based on his belief that the reasonable charges for the services provided to his daughter would be the lower amount that Medicaid would have paid. For purposes of the attorney fees issue, the exact amount of Medicaid reimbursement would not have significantly enhanced his argument.

*Attorney Fees on Appeal*

Lastly, we note that Mercy has filed motions requesting attorney fees and other expenses incurred in this appeal in the total amount of $16,636.75. Of this amount, $16,160 is for attorney fees and $476.75 is for assorted expenses for transcripts, copying, printing, court clerk fees, mileage, and tolls. Brinegar has filed no response. He has never questioned the time spent by Mercy's attorneys, the amount charged for it, or the other expenses listed.

An appellate court has authority to award attorney fees under Supreme Court Rule 7.07(b) (2009 Kan. Ct. R. Annot. 61) on appeal in cases where the trial court had authority to award attorney fees. See *Hodges v. Johnson*, 288 Kan. 56, 74, 199 P.3d 1251 (2009). Mercy has requested an award of attorney fees on appeal under K.S.A. 60-211 and K.S.A. 50-634(e).

A couple of significant points compel us to conclude it would not be appropriate to award of all of the attorney fees and expenses that Mercy requests on appeal. First, we note again at this point that the trial court awarded the amount of $8,318.50 to Mercy, roughly one half of the amount Mercy is requesting on appeal. The award was for attorney fees incurred during 1 year of protracted litigation. It included a trial which is recorded in a 210-page transcript. Second, we also note that while we are affirming the trial court's ruling that awarded attorney fees to Mercy based upon Brinegar's filing of a counterclaim for an improper purpose, Brinegar's appeal was not completely frivolous, particularly in light of the continuous reference by the trial judge in his opinion to the manner in which Brinegar prosecuted his counterclaim after he had signed and filed it with the court. As we stated, such activity is not sanctionable under K.S.A. 60-211.

At the same time, this appeal stemmed from Brinegar's original abuse of the legal system. The costs incurred by Mercy on appeal are a part of the continuum of unfortunate and otherwise avoidable events caused by that improper conduct. Sanctions in some amount for the attorney fees expended by Mercy on appeal are certainly appropriate.

We have examined the affidavits accompanying Mercy's motion and conclude that a proper fee to be awarded Mercy for its attorney fees and expenses incurred in this appeal is $8,300.

*Conclusion*

The district court's judgment in favor of Mercy Regional Health Center, Inc., against Jason Brinegar for attorney fees in the amount of $8,318.50 is affirmed. Mercy's motion for attorney fees in connection with this appeal is granted, and Mercy is awarded an additional amount of $8,300.

Affirmed.

\*　\*　\*

MARQUARDT, J., concurring in part and dissenting in part: I concur in part and respectfully dissent in part. I concur with the majority opinion that affirms the district court's award of attorney fees incurred by Mercy Regional Health Center, Inc. (Mercy), while the case was being litigated in the district court.

I dissent from the majority opinion that only awarded approximately two-thirds of the amount requested for appellate attorney fees in spite of the conclusion that "Bringer brought his counterclaim for an improper purpose" in the first place. When it came to Mercy's request for attorney fees on appeal, the majority states that "this appeal stemmed from Bringer's original abuse of the legal system" and rationalizes the partial award upon examination of the affidavits without further explanation. This case from the beginning was baseless. There are more than sufficient facts to support the entire amount of appellate attorney fees requested. I would therefore award Mercy the $12,766.45 it requested.