No. 118,246

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Marriage of

DENISE LYNN THRAILKILL,
*Appellee*,

and

ROY DOUGLAS THRAILKILL,
*Appellant*.

SYLLABUS BY THE COURT

1.

A military retiree can provide an annuity for a spouse, payable in the event of the service member's death, under what Congress has named the Survivor Benefit Plan. In some cases, upon a divorce, the divorce court can order that the retiree elect the spousal annuity. If such an order is entered and the retiree does not file paperwork to make that election, the spouse can file the paperwork and the service member is deemed to have made the election. To have a deemed election, the spouse must file the required paperwork within one year of the court order, but that time period doesn't begin to run until the time to appeal has run or, if an appeal is filed, the appeal has concluded.

2.

Under the Kansas Child Support Guidelines, income from all sources is included when child support is calculated. The district court in this case properly included the military retired pay set aside to each party in the party's income for child-support purposes.

3.

The Kansas Child Support Guidelines provide for modification of the support amount if, among other things, a change in income would result in a 10% change in the child-support amount. The district court in this case did not abuse its discretion by not calculating different worksheets to show anticipated changes contingent on future events that had not been shown to constitute a material change under the guidelines.

4.

The district court did not abuse its discretion in the establishment of maintenance by failing to account for a likely reduction in part of one party's income when the court separately recognized that likely adjustment when it decided how to allocate a debt of the parties.

5.

On request, the district court must set a valuation date to be used for all assets and debts at trial. But the court may also consider things that happen before or after the valuation date. Here, the district court could treat a student loan taken out for the benefit of the parties' son as marital debt when both parties had agreed to take out the loan and the loan was taken out before the parties' financial issues were resolved at trial.

Appeal from Graham District Court; GLENN R. BRAUN, judge. Opinion filed September 27, 2019. Affirmed in part and dismissed in part.

*Heather R. Fletcher*, of Johnson Fletcher, LLC, of Hays, for appellant.

*Todd D. Powell*, of Glassman Bird Powell, LLP, of Hays, for appellee.

Before ATCHESON, P.J., MALONE and LEBEN, JJ.

LEBEN, J.: Doug Thrailkill appeals three aspects of the district court's ruling in his divorce case. We'll start with an overview of the arguments and our resolution of them.

First, Doug argues that the district court had no authority to enter orders related to the survivor-benefit plan associated with the pay he receives as a retired military officer. Doug notes that the district court granted a divorce between the parties many months before the court addressed financial issues. That's a process we call a bifurcated divorce, in which the court first grants the parties a divorce and holds the resolution of financial issues for later. Doug argues that federal law provides that no one—including the state court handling his divorce case—can make orders related to the survivor-benefit plan after a bifurcated divorce has been granted without mention of the annuity. But he cites no authority in support of that proposition.

We are convinced that no such limit existed here on the district court's authority. First, we find nothing in the applicable federal statutes that limits the authority of a state divorce court to make such orders. Second, while there are time deadlines after the state court makes its order for the former spouse to notify the appropriate military officials of the court's order, those time limits are triggered by a *final* court order. A bifurcated divorce decree isn't a final judgment under Kansas law, and federal law provides that an order isn't final until appeals have concluded. So no time limit on the district court's ability to order former-spouse coverage could have expired.

Second, Doug complains that the court both divided his military retirement pay and also included retirement pay in the parties' income for calculating maintenance and child support. But it's appropriate to consider all of the parties' income for those purposes. The court first divided the retirement pay, and it then allocated the portion of the pay it had awarded to Doug's former wife, Denise, as income to her when the court made its maintenance and child-support calculations. We find no error in the trial court's approach.

3

Third, Doug argues that the court shouldn't have ordered that he pay off part of a student loan taken out to benefit one of their children. Doug argues that the child had already turned 18 and that the loan proceeds were disbursed after the bifurcated divorce decree had been filed. But the district court heard evidence that Doug had at first agreed to take out the loan, and the district court has broad authority in a divorce action to divide the parties' assets and debts equitably. We once again find no error in the trial court's decision.

Doug also tried to raise one other issue on appeal—a challenge to the district court's order on a motion Denise made to enforce the court's orders. But we don't have jurisdiction to consider the appeal of that order. It was entered after final judgment and after Doug had filed his notice of appeal; as a result, Doug's notice of appeal didn't mention it. We have jurisdiction only over rulings identified in the notice of appeal, so we lack jurisdiction in this appeal over a postjudgment dispute.

FACTUAL AND PROCEDURAL BACKGROUND

Doug and Denise married in 1992, and both were in the Air Force. For most of the marriage, Doug was a commissioned officer. Denise separated from active duty and joined the Air Force Reserves after their first child was born. They ultimately had two children and had settled in Kansas by the time they both retired from the military.

Their retirement benefits differed. Because Doug had remained on active duty and had served more than 20 years, he had an immediate benefit at retirement of military retired pay of $3,702 per month. Denise had 10 years on active duty and 10 in the reserves, so her retired pay won't start until she reaches age 60.

4

Doug retired in October 2012, about three years before Denise filed for divorce in January 2016. When he retired, Doug also received some disability pay based on a 50% disability connected to his military service.

After his military retirement, Doug initially had private-sector employment, but he quit his job at about the same time Denise filed for divorce, citing mental-health reasons. The Veteran's Administration increased his disability rating in June 2016 to 100%, citing posttraumatic stress disorder. That gave Doug a disability benefit of $3,400 per month.

Denise also worked after retiring from the Air Force. She worked between 30 and 40 hours per week as a law-office secretary and also worked as a waitress.

The parties separated in February 2016, the month after Denise filed for divorce. Within a few months, the parties agreed to bifurcate the case, handling it in two parts. First, in August, the court issued a divorce decree, finding that the parties were incompatible and that "[Denise] is therefore granted a divorce from [Doug] upon the grounds of incompatibility." Second, the decree provided that "[a]ll other issues are reserved for future determination either by agreement" or "by trial." When the parties couldn't reach a settlement agreement, they presented evidence at a trial held in March 2017. The district court considered that evidence and issued a written ruling that May.

The court equally divided the parties' retirement pay. That gave Denise half, or $1,851, of Doug's monthly retired pay; Doug will get half of Denise's retired pay once she turns 60 and begins receiving it. Doug was 47 and Denise was 46 at the time of trial.

The court awarded $300 per month in maintenance to Denise to equalize the parties' incomes for an eight-year period. The court noted that the parties had worked together to further Doug's career and income; Denise switched to the reserves and did most of the childcare while the family established several new homes as they often

5

moved for Doug's new military assignments. The court calculated the $300 payment amount after considering the retirement pay each party would receive under the court's order, Doug's disability payment, and Denise's earnings from her two jobs.

The court also ordered Doug to pay half of the $11,000 remaining balance on a loan taken out to help finance their son's education. The court cited Doug's testimony that he had agreed to take out the loan but said that when the time came for Doug to sign the loan documents, "he was either unavailable or refused to do so[,] which then necessitated [Denise] signing the loan documents."

The court also considered a dispute over a program that provides a portion of the military retired pay to a service member's spouse or children after a retired service member's death. Under this plan, the service member pays an insurance premium and in return the designated survivor gets a lifetime annuity at 55% of the selected base amount, usually the service member's full retirement pay. This benefit comes through what Congress named the Survivor Benefit Plan. See 10 U.S.C. §§ 1447(1), 1448 (a)(1) (2012). When a service member retires while married, the service member must elect coverage under this plan at the time of retirement. And for a married service member, the base amount is the full amount of the retired pay unless the spouse consents to a lesser amount. See 10 U.S.C. § 1447(6)(A) (2012); 10 U.S.C. § 1448(a)(3)(A)(ii) (2012); Higdon, *The Survivor Benefit Plan: Its History, Idiosyncrasies, Coverages, Cost, and Applications*, 43 Fam. L. Q. 439, 449-51 (2009).

Doug retired while married to Denise, and the parties agree that he elected to insure a survivor benefit for Denise. But the benefit chosen wasn't in the maximum amount. Instead, as best we can tell (as the trial exhibits weren't in our record), the parties insured only $771 of Doug's $3,702 per month in military retired pay. That would give Denise a lifetime annuity of $424 (55% of $771) per month if she outlives Doug.

Denise asked that the court order an increase in the insured amount, and the court granted that request. Apparently because Doug testified that he didn't know whether the amount could be increased—and the parties' attorneys didn't provide any definitive answer about it—the court ordered that "if possible, [Doug] is ordered to increase the Survivor [B]enefit Plan (SBP) to an amount equal to one half of the benefit . . . ." The court ordered that Denise pay the cost of the additional insurance premiums required to do that.

ANALYSIS

I. *Doug Has Not Shown That the District Court Lacked Authority to Order That He Elect Former-Spouse Coverage Under the Survivor Benefit Plan.*

Doug's first argument is that the district court had no authority at trial to enter orders related to the Survivor Benefit Plan. Doug contends that the Survivor Benefit Plan that at first benefitted Denise as Doug's spouse was eliminated when a divorce decree was entered that didn't mention the plan. In support of his argument, Doug cites generally to one of the federal statutes governing Survivor Benefit Plan benefits, 10 U.S.C. § 1448 (2012), and to one case decided by our court in 1986, *In re Marriage of Morton*, 11 Kan. App. 2d 473, 726 P.2d 297 (1986).

We can easily set the *Morton* case aside as irrelevant to our situation. It did have factual similarities to our case—in both cases, the wife sought to have the husband, who had military retirement, elect to give her a survivor annuity after the divorce. But when the Mortons were divorced, federal law didn't allow a court to order the service member to do anything about who would receive that benefit. See Higdon, 43 Fam. L. Q. at 448-49. So the *Morton* court properly held that courts then had no power to make an unwilling husband elect to provide the survivor-benefit annuity to his soon-to-be ex-wife. 11 Kan. App. 2d at 476.

7

That's not the case today. Effective November 14, 1986, Congress amended the law so that a divorce court could order a service member to retain his or her spouse as the Survivor Benefit Plan beneficiary after the divorce. See Pub. L. 99-661, § 641, amending 10 U.S.C. § 1448; Higdon, 43 Fam. L. Q. at 448-49. Later, when some service members didn't carry out court orders to elect former-spouse coverage, Congress added one more option—if the court has ordered the service member to elect former-spouse coverage, the former spouse can file the court order with the military and the service-member spouse will be deemed to have elected former-spouse coverage. See 10 U.S.C. § 1450(f)(3) (2012); Oldham & Tucker, *The Armed Forces Survivor Benefit Plan: Can I Be a Beneficiary and Why Do I Care?*, 29 J. Am. Acad. Matrim. Law. 149, 160 (2016). That's referred to by most attorneys as a "deemed election."

Given these important changes to the Survivor Benefit Plan statutes, we must carefully look at the statutory provisions now in place. That will give us the context to see whether Doug is right when he argues that the district court lost the ability to enter any orders about the survivor-benefit annuity when that annuity wasn't mentioned in the court's initial bifurcated divorce decree.

All the relevant federal statutes are in Title 10 of the United States Code, which governs the United States Armed Forces; the key provisions for us are sections 1448 and 1450. See 10 U.S.C. §§ 1448, 1450 (2012). We will review them to see how the two possible ways to get former spouse coverage can work: (1) an election of former-spouse coverage by the service member or (2) a deemed election of former-spouse coverage through a court order and notification to the proper authorities by the former spouse.

We start with election by the service member, covered by section 1448. In the Thrailkills' case, Doug was already receiving retired pay when the parties divorced. For that situation, the process under which Doug could elect former-spouse coverage is

covered in subsection (b)(3). We will first set out that statutory provision and then explain how it applies:

"(3) Former spouse coverage by persons already participating in Plan.—

(A) Election of coverage.—

(i) Authority for election.—A person—

(I) who is a participant in the Plan and is providing coverage for a spouse . . . and

(II) who has a former spouse who was not that person's former spouse when that person became eligible to participate in the Plan,

may (subject to subparagraph (B)) elect to provide an annuity to that former spouse.

(ii) Termination of previous coverage. Any such election terminates any previous coverage under the Plan.

(iii) Manner and time of election.—Any such election must be written, signed by the person making the election, and received by the Secretary concerned within one year after the date of the decree of divorce, dissolution, or annulment." 10 U.S.C. § 1448(b)(3) (2012).

Like many statutes, you have to work through it sequentially, and many parts relate to one another. The wording of subsection (b)(3)(A)(i), which provides authority for the service member to elect former-spouse coverage, may strike a reader as a little odd, as it speaks of both a spouse and a former spouse—and they turn out to be the same person. Eligibility to make the former-spouse election has two requirements: (1) that the person be a Plan participant who is already providing coverage for a spouse and (2) that the participant have a former spouse who was *not* a former spouse when Plan participation began. 10 U.S.C. § 1448(b)(3)(i) (2012). Doug fits both criteria. Because he was married to Denise when he began receiving retired pay, she was included in spouse coverage. See 10 U.S.C. § 1448(a)(3)(A)(i) (2012); Higdon, 43 Fam. L. Q. at 449. And when they got divorced, she became a former spouse who was not a former spouse when

the coverage began. So Doug had authority to voluntarily elect former-spouse coverage for Denise—authority that would not terminate until one year after the divorce.

Doug's argument, of course, is that the court lacked authority to order him to elect former-spouse coverage. Section 1448 governs Doug's ability to *voluntarily* elect that coverage, not the divorce court's authority to order him to do so.

The portion of section 1448 we've quoted did reference some limitations in subsection (b)(3)(B), but those do not apply here; they apply only when the service member got married after beginning to receive retired pay. See 10 U.S.C. § 1448(b)(3)(B) (2012). In sum, nothing in section 1448 purports to limit the authority of a state divorce court to enter orders about the former-spouse annuity. Instead, at least as it applies in our case, section 1448 merely provides authority for Doug to make a voluntary election to provide former-spouse coverage to Denise; it does not limit the divorce court's authority.

That takes us to section 1450, the section that authorizes a court order that the service member elect former-spouse coverage. To make sure that order is implemented, section 1450 provides in subsection (f)(3) for a deemed election. In a deemed election, the former spouse sends to the appropriate official a request for a deemed election plus a court order that either (1) required the service member to elect former-spouse coverage or (2) approved the parties' written agreement to do so:

> "(f) Change in election of . . . former spouse beneficiary.—
> . . . .
> (3) Required former spouse election to be deemed to have been made.—
> (A) Deemed election upon request by former spouse.—If a person described in paragraph (2) or (3) of section 1448(b) of this title is required (as described in subparagraph (B)) to elect under section 1448(b) of this title to provide an annuity to a former spouse and such person then fails or refuses to make such an election, such person

10

shall be deemed to have made such an election if the Secretary concerned receives the following:

 (i) Request from former spouse.—A written request, in such manner as the Secretary shall prescribe, from the former spouse concerned requesting that such an election be deemed to have been made.

 (ii) Copy of court order or other official statement.—Either—

 (I) a copy of the court order, regular on its face, which requires such election or incorporates, ratifies, or approves the written agreement of such person; or

 (II) a statement from the clerk of the court (or other appropriate official) that such agreement has been filed with the court in accordance with applicable State law.

 (B) Persons required to make election.—A person shall be considered for purposes of subparagraph (A) to be required to elect under section 1448(b) of this title to provide an annuity to a former spouse if—

 (i) the person enters, incident to a proceeding of divorce, dissolution, or annulment, into a written agreement to make such an election and the agreement (I) has been incorporated in or ratified or approved by a court order, or (II) has been filed with the court of appropriate jurisdiction in accordance with applicable State law; or

 (ii) the person is required by a court order to make such an election.

 (C) Time limit for request by former spouse.—An election may not be deemed to have been made under subparagraph (A) in the case of any person unless the Secretary concerned receives a request from the former spouse of the person within one year of the date of the court order or filing involved.

 (D) Effective date of deemed election.—An election deemed to have been made under subparagraph (A) shall become effective on the day referred to in section 1448(b)(3)(E)(ii) of this title." 10 U.S.C. § 1450(f)(3) (2012).

With the language of section 1450(f) now in front of us, we will work through its provisions. Subsection (A) provides for a deemed election through the request of the former spouse when a person who had the eligibility to make the former-spouse election, as Doug did, "is required" to do so and "then fails or refuses to make such an election." We learn in subsection (B) that a person is considered "required to elect" if a court has

11

approved that person's agreement to make the election or if the court orders the person to do so. The deemed election is accomplished, as set out in subsection (A), when the former spouse sends military officials the court order either requiring election or approving an agreement to do so.

Subsections (C) and (D) relate to timing. Under subsection (C), the former spouse must get the request to the proper official "within one year of the date of the court order or filing involved." Under subsection (D), the deemed election becomes effective at the same time as a service member's election under section 1448 would—"the first day of the first month which begins after the date of that court order or filing." See 10 U.S.C. § 1448(b)(3)(E)(ii) (2012).

Once again, there's nothing in section 1450 that would have taken away the authority to order Doug to elect former-spouse coverage from the Kansas divorce court. Since Doug and Denise didn't reach a settlement agreement, the only way for Denise to use the deemed-election process was if the court ordered Doug to elect former-spouse coverage. It did so. And there was no time limit in the federal statute for the court to make that order; the only time limit was for notice to military authorities to trigger a deemed election. Doug hasn't pointed to anything in section 1450 that would preclude the order here; nor have we found anything that would do so.

Doug has not questioned the underlying authority of a Kansas divorce court to order a military retiree to elect former-spouse coverage; he has only argued that, on our facts, federal law didn't allow the court to order former-spouse coverage. But that's something the federal statute specifically says *may* be done: "A court order may require a person to elect . . . under section 1448(b) . . . to provide an annuity to a former spouse . . . ." 10 U.S.C. § 1450(f)(4) (2012). The "court" referenced there can be any state court handling a divorce, annulment, or legal-separation case. See 10 U.S.C. § 1447(12), (13) (2012); 10 U.S.C. § 1408(a)(1) (2012). And a Kansas divorce court has broad

12

authority over property rights of parties to a divorce action, including military-pension rights. See K.S.A. 2018 Supp. 23-2801; *In re Marriage of Williams*, 307 Kan. 960, Syl. ¶ 2, 417 P.3d 1033 (2018).

So far, we've found nothing in the federal statutory provisions for servicemember election or deemed election of this option that takes away a state court's authority to make such an order. We conclude by considering the statute's timing provisions, but once again we find nothing that would make the court's order in the Thrailkills' case ineffective.

There are timing provisions in both sections 1448 and 1450. For the voluntary election under section 1448, the election must be in writing and "received by the Secretary concerned within one year after the date of the decree of divorce, dissolution, or annulment." 10 U.S.C. § 1448(b)(3)(A)(iii) (2012). For the deemed election under section 1450, the former spouse's request for the deemed election must be "receive[d] . . . within one year of the date of the court order or filing involved." 10 U.S.C. § 1450(f)(3)(C) (2012).

Perhaps Doug is suggesting that the one-year deadline in section 1448—"one year after the date of the decree of divorce"—had expired. The district court issued the bifurcated divorce decree on August 9, 2016, and although it ordered the former-spouse coverage in a written order less than one year later (on July 27, 2017), it didn't finish handling posttrial motions until August 16, 2017. But the one-year deadline in section 1448 relates only to a voluntary election by Doug; it doesn't limit the court's ability to order Doug to make the election.

The deadline in section 1450 is written differently—rather than referencing the date of the decree, it says "within one year of the date of the court order or filing involved." 10 U.S.C. § 1450(f)(3)(C) (2012). The term "court order" is a defined term, meaning "a court's final decree of divorce, dissolution, or annulment or a court ordered,

ratified, or approved property settlement incident to such a decree." 10 U.S.C. § 1447(13)(A) (2012). And "final decree" is also defined. In a case like this one that involves an appeal, there's no final decree until any appeals that may be taken have either been foregone or decided:

> "The term 'final decree' means a decree from which no appeal may be taken or from which no appeal has been taken within the time allowed for the taking of such appeals under the laws applicable to such appeals, or a decree from which timely appeal has been taken and such appeal has been finally decided under the laws applicable to such appeals." 10 U.S.C. § 1447(13)(B) (2012).

So the one-year deadline for a deemed election in the Thrailkills' case still has not yet begun to run at all. It would begin to run only on the issuance of a "final decree," but the decree isn't "final" until any appeals have been resolved.

Even if we were to focus on the voluntary election under section 1448, that deadline probably hasn't begun to run, either. The term to trigger the one-year deadline there is "the date of the decree," and "decree" by itself isn't a specifically defined term; only "final decree" is. But we generally construe related statutory sections together— what lawyers speaking Latin call "*in pari materia*" or in the same matter—aiming to reconcile them and bring them into workable harmony. *In re Paternity of S.M.J. v. Ogle*, 54 Kan. App. 2d 618, 620, 402 P.3d 607 (2017), *aff'd* 310 Kan. ___, 444 P.3d 997 (2019). The wording difference we've noted between the deadline trigger in sections 1448 and 1450 may simply be attributable to their adoption at different times. But we can think of no reason they should be interpreted differently.

For our case, though, it would make no difference if they were interpreted differently. The court's ability to order Doug to make the election comes through section 1450, and the deadline trigger there is a "final decree" as defined. The only potential argument we can think of that Doug might have made is that the bifurcated decree itself

14

was "final" when it was entered—no one appealed it, even though disputes over property and support remained for resolution.

But that argument is foreclosed by Kansas law about bifurcated divorces. In *McCain v. McCain*, 219 Kan. 780, Syl. ¶ 2, 549 P.2d 896 (1976), the Kansas Supreme Court held that a divorce case doesn't become final—and the time deadline to appeal doesn't begin to run—until the court rules on all the issues in the case, even if it first grants a bifurcated divorce decree. That makes sense because a divorce is a single legal claim between two parties. Since it concerns only a single legal claim, the provisions of K.S.A. 2018 Supp. 60-254(b)—which let a judge certify a final judgment on some issues when there is more than one claim or more than two parties—don't apply. So even if the court wanted to do so, it couldn't certify the initial bifurcated decree as a final judgment. See Leben, *Practitioner's Guide to Kansas Family Law* § 21.26a (2001 Supp.). And in the Thrailkills' case, the court didn't try to certify the bifurcated decree as a final judgment. That means that the time to appeal didn't run until the district court had resolved the parties' financial disputes, and the time deadline provided under section 1450 still has not expired.

Doug raises one other issue about the court's Survivor Benefit Plan order. Ordinarily, the spousal coverage is obtained at the maximum allowed by law, which results in an annuity at 55% of the amount of the retired pay if the service member dies and the spouse survives. But a lower amount can be selected and was here. The district court also ordered that Doug raise the annuity amount back to the maximum "if possible." Doug argues that it's impossible to do so.

But his argument on that point relies on facts that aren't in the appellate record, which doesn't include the exhibits admitted in the parties' trial. And we have competing testimony on a key point.

15

Doug contends that the spousal annuity was set at a lower amount with Denise's consent. Denise's consent would have been legally required to do that. See 10 U.S.C. § 1448(a)(3)(A)(ii) (2012). Doug contends that the election to participate at a lower level can't be changed after he begins taking retired pay.

But we don't have conclusive evidence that Denise consented to a lower annuity level. She testified that she "never agreed to the lower coverage." He testified that he didn't remember whether she had to sign a document about the lower-coverage amount. We can't decide on this record whether, even under Doug's understanding of the law, any binding election was made; it's not clear to us that Denise consented.

Even if she did, that may not end the matter; we don't find a bar to restoring the maximum benefit in the statutory section cited by Doug, 10 U.S.C. § 1448(a)(4) (2012). It does make one type of election irrevocable if not revoked before the service member starts taking retired pay. But that election is the one under 10 U.S.C. § 1448(a)(2)(A) (2012) "not to participate in the Plan" at all. See 10 U.S.C. § 1448(a)(2)(A) (2012); 10 U.S.C. § 1448(a)(4) (2012). Doug has not cited a statutory provision making the election to participate at a lower level nonmodifiable. Given the uncertainty of the evidence and the argument made by Doug on appeal, we find no error in the district court's order that the annuity be restored to the maximum legal level "if possible."

II. *The District Court Did Not Err in Its Calculation of Maintenance and Child Support.*

Doug next challenges the district court's award of maintenance and child support in two ways. First, he argues that the court shouldn't have included any of his retired pay in the court's calculations when it determined maintenance and child support. Doug argues that since the court had already divided the retired pay equally between the parties, it shouldn't have also included it as part of the parties' income for support purposes. Second, he argues that the court should have used a reduced figure for the

16

disability payments Doug receives based on testimony that they would be reduced after the divorce action concluded.

On both maintenance and child support, we review the district court's award for abuse of discretion. See *In re Marriage of Vandenberg*, 43 Kan. App. 2d 697, 706-07, 299 P.3d 1187 (2010) (maintenance); *In re Marriage of Branch*, 37 Kan. App. 2d 334, 336, 152 P.3d 1265 (2007) (child support). If interpretation of our state's child support guidelines is required, that legal issue is reviewed independently. 37 Kan. App. 2d at 336. The district court abuses its discretion if its decision is based on a legal or factual error or if no reasonable person would agree with the court's decision. *Wiles v. American Family Life Assurance Co.*, 302 Kan. 66, 74, 350 P.3d 1071 (2015).

Doug's first point is illogical. He claims that unfairness results when the court first treats the income stream as property and divides it, followed by consideration of the amount of income each party will then receive monthly after the court's division. But what's happening here is no different than what happens in many divorce cases. Let's say one of the parties owns a car wash that generates income, and the court awards the car wash to the wife. There's no reason—having awarded the car wash as property—that the court should ignore the income that the wife will receive from that property. And if the court divided the car wash between the parties, there'd still be no reason to ignore the income the car wash generates.

Doug recognizes that it's appropriate for a divorce court to treat military retired pay as property and divide it between the parties. See K.S.A. 2018 Supp. 23-2801(a); *In re Marriage of Harrison*, 13 Kan. App. 2d 313, Syl., 769 P.2d 678 (1989). Once that has been done, the court knows what income will flow to each party afterward. The court *must* consider that income for child-support purposes; our state child-support guidelines require that "income from all sources" be included when child support is calculated. Kansas Child Support Guidelines § II.D. (2019 Kan. S. Ct. R. 83); see *In re Marriage of*

17

*McPheter*, 15 Kan. App. 2d 47, 48, 803 P.2d 207 (1990). And there's no abuse of discretion when considering that income for maintenance purposes, either.

For maintenance, unlike child support, there are no statewide guidelines to guide the court. So the trial judge can approach whether to award maintenance and, if so, how to determine the amount in many ways. Here, the judge decided that he wanted roughly to equalize the parties' income for eight years after the divorce; Denise had made significant career sacrifices as part of the decisions she and Doug made during the 23-year marriage. Given that approach from the trial court, we note that it made no difference whether the court considered the retired pay as income (giving each party another $1,851 per month) or considered only their other income sources. Either way, the court looked at the absolute difference between each parties' total monthly income, $627 per month, and then ordered $300 in maintenance to equalize the income. The court didn't err in considering the amount of military retired pay each party would receive when calculating either child support or maintenance.

Doug's point about his disability income has more substance to it. The district court found that Doug's disability income at the time of trial was $3,460 per month, a figure not contested here. Doug notes, though, that he testified that his disability payment would go down $100 per month after the divorce concluded. He also testified that the parties' two children were eligible for a $1,000 per month education benefit; he said his disability income would go down $200 per month for each child that took that benefit. At the time of trial, Doug said that one child had already applied for the benefit and that he hoped the other (who was still in high school at trial) would do so the next year. Based on these expected changes, Doug argues that the district court should have used the reduced disability amounts when it calculated child support and maintenance. Because the rules for determining child support and maintenance differ, we will consider them separately.

Child support must be determined under the Kansas Child Support Guidelines, and Doug doesn't cite any provision of those guidelines in his argument on this issue. We find no provision that contradicts the district court's order. The court took the parties' income as presented at trial when calculating child support; the court didn't do a separate worksheet to reflect each of the expected adjustments that might take place later. The guidelines do have provisions that would let the court modify the child support later for changed circumstances if that would result in a 10% change in the child-support amount. See Kansas Child Support Guidelines § V.B.1. (2019 Kan. S. Ct. R. 106). But Doug has not shown that the 10% threshold would be met even when all the potential changes he cited are taken together—and one of them (the second child's use of the military educational benefit) wasn't to occur, if at all, until the year after the trial. The district court need not calculate different worksheets at trial to reflect anticipated changes that would not constitute a material change under the guidelines. We find no error in the district court's child-support calculation.

As we've mentioned, there are no statewide guidelines for maintenance. The court may award maintenance for the future support of a party "in an amount the court finds to be fair, just and equitable under all of the circumstances." K.S.A. 2018 Supp. 23-2902(a). That gives the trial court broad discretion in determining the amount of a maintenance award. See 2 Elrod, Kansas Law and Practice: Kansas Family Law § 10:24 (2018-2019 ed.).

Doug argues that the district court abused its discretion because it failed to account for the likely reduction in Doug's disability income and also adopted an escalator clause. Doug was unemployed at the time of trial, but the escalator clause provided that if he gained employment, Denise would be entitled to 20% of the new income as maintenance. (The parties' adult son testified that, despite his disability, Doug intended to return to work after the divorce.) Doug argues that the combination of the failure to account for a

19

likely decrease in his disability-income benefit and an award of a percentage of any new income he might gain was unfair.

But the district court did take the expected reduction in the disability payments into account—just not in its maintenance award. When the court ordered that Doug be responsible for half of the remaining balance on the student loan taken out for the parties' oldest child, the court noted that Denise had "already made substantial payments on the loan." The court did not order that Doug reimburse Denise for half of the payments already made in part based on consideration of the expected reduction in Doug's disability income. The court said that not making an adjustment in Doug's income was "a way to offset the payments on the student loan by [Denise] prior to" the trial.

Given that context, the district court did not abuse its discretion when it calculated maintenance based on the income Doug had at the time of trial rather than on a reduced amount based on a small percentage decline in his disability income. The court can consider the parties' overall financial situation, including debts and recent payments on debts, when determining the amount of maintenance. In essence, the court considers property division and maintenance together so that—taken together—the result is equitable. See *In re Marriage of Sedbrook*, 16 Kan. App. 2d 668, 675, 827 P.2d 1222 (1992); 2 Elrod, Kansas Law and Practice: Kansas Family Law § 10:24 (2018-2019 ed.). The timing and extent of the reduction in Doug's disability income wasn't known precisely, so the court used an approximate understanding of that reduction as an offset against what it otherwise might have ordered Doug to pay on the student loan. Under the abuse-of-discretion standard, we find that a reasonable person could agree with the trial court's approach. We therefore find no abuse of discretion.

20

III. *The District Court Did Not Err in Ordering that Doug Pay Part of a Student-Loan Debt.*

The next issue involves a $22,000 loan Denise took out to help pay for college expenses of the parties' son. Doug testified that he "had agreed to take the loan out [himself] in the beginning." After the parties separated, though, Denise found that she couldn't access funds under the papers Doug had prepared because the loan was in Doug's name. She forwarded a form for Doug to sign but he didn't respond. Then when their son asked Doug about it, Doug told him to have Denise sign for the loan. Denise committed to the loan after filing of the divorce action but before issuance of the bifurcated divorce decree; the loan proceeds were paid out after the decree was issued but well before the trial on financial matters.

At the time of trial, Denise had been making payments on the loan, reducing the balance to $11,000. The district court ordered that this remaining balance be paid equally by Doug and Denise.

Doug argues that this was improper for two reasons. First, he notes that he has no obligation to support his children past the age of majority. See K.S.A. 2018 Supp. 23-3001. He argues that the court is making him provide post-majority support to his son by assigning part of the debt to him. Second, Doug notes that the valuation date agreed upon by the parties for trial was the date Denise filed for divorce, January 29, 2016. Doug argues that the loan therefore was not marital debt and couldn't be divided between the parties.

The trial court has broad discretion in the division of marital property and debts. *In re Marriage of Wherrell*, 274 Kan. 984, 986, 58 P.3d 734 (2002). So our review is once again for abuse of discretion, which occurs if the trial court's decision is based on a legal

or factual error or if no reasonable person would agree with the court's decision. *Wiles*, 302 Kan. at 74. Both of Doug's arguments suggest a legal error by the trial court.

Doug's first argument—that the court's order really constituted an order that he support his son after the son was an adult—mischaracterizes the trial court's decision. The court treated the student loan, taken out in Denise's name and for which Denise was legally responsible, as a marital debt. The court made no order for Doug to provide any ongoing support to his son; the court simply divided the remaining student-loan debt between the parties.

Doug's second argument essentially asks that a divorce court ignore any financial transactions that take place after the valuation date. That's not required under the valuation-date statute Doug cites.

K.S.A. 2018 Supp. 23-2802(b) provides that the court, on request, "shall set a valuation date to be used for all assets at trial." Doing so makes sure that there's an apples-to-apples comparison of the values of various assets all taken on about the same date. But the court isn't required to ignore things that happen after the valuation date. As the statute puts it, "The trial court may consider evidence regarding changes in value of various assets before and after the valuation date in making the division of property." K.S.A. 2018 Supp. 23-2802(b); see 2 Elrod, Kansas Law and Practice: Kansas Family Law § 10:7 (2018-2019 ed.).

Here, Doug had agreed to take out the student loan before the divorce was filed; Denise took the loan out after the divorce was filed (and thus after the valuation date the parties agreed to). The district court noted Doug's agreement to take the loan out and the difficulty Denise had in repaying it. The court then divided the remaining balance between the parties. Although the loan was finalized and proceeds paid out after the valuation date, Doug had committed to the loan before that date. And the valuation-date

22

statute specifically allows consideration of events after the valuation date. We think a reasonable person could agree with that decision, so there's no abuse of discretion.

IV. *We Have No Jurisdiction in This Appeal Over the District Court's Postjudgment Orders.*

Finally, we note that Doug sought to raise one other issue on appeal, but it's an issue we have no jurisdiction to consider. The dispute relates to an order the district court made after entry of judgment on Denise's motion to enforce the court's orders.

The jurisdictional problem arises because we have jurisdiction only over rulings identified in the notice of appeal. See *Associated Wholesale Grocers, Inc. v. Americold Corporation*, 293 Kan. 633, 637, 270 P.3d 1074 (2011). Since the notice of appeal was filed several months before the court issued the ruling Doug wants to challenge, the notice of course never mentioned that postjudgment ruling.

Denise responded to this issue in her appellate brief by challenging our jurisdiction to consider it, and Doug filed no reply brief to respond to the jurisdictional issue. We conclude that we lack jurisdiction over this final issue on appeal.

We therefore dismiss Doug's appeal of the court's postjudgment order, and we affirm the district court's judgment.