NOT DESIGNATED FOR PUBLICATION

No. 123,910

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Marriage of

JALYN O'MALLEY,
*Appellee*,

and

JOSEPH O'MALLEY,
*Appellant*.


MEMORANDUM OPINION

Appeal from Crawford District Court; KURTIS I. LOY, judge. Opinion filed May 20, 2022. Affirmed.

*T. Bradley Manson* and *Austin Meagher-Manson*, of Manson Karbank McClaflin, of Overland Park, for appellant.

*Frederick R. Smith*, of Pittsburg, for appellee.


Before POWELL, P.J., GREEN, J., and RICHARD B. WALKER, S.J.


PER CURIAM: Joseph O'Malley appeals the trial court's divorce decree. Joseph and Jalyn O'Malley signed a premarital agreement in 1999. The trial court ruled that Jalyn did not voluntarily execute the premarital agreement. The trial court also ruled that the agreement was unconscionable and unenforceable and proceeded to a bench trial. Joseph argues that the trial court's division of marital property after the trial was incorrect because it was based on incorrectly excluding evidence of the premarital agreement. Because the trial court correctly made a division of property in this matter, we affirm.

1

Joseph has farmed continuously since he was 18 years old. With guidance from his father, Joseph bought his first piece of farmland, which he calls his "Homestead." Shortly after that, Joseph met Jalyn and in less than a year, Jalyn moved into the Homestead. Joseph was 19 and Jalyn was 24 or 25 when she moved in sometime in 1990 or 1991. Jalyn and Joseph signed a prenuptial agreement (Agreement) on September 21, 1999, and they married on September 24, 1999. At trial, Jalyn testified that during the eight years leading up to the marriage, she felt like she was a regular participant in the farming operation. She knew that Joseph owned the Homestead. During the marriage, they had two children. After their second child was born, Jalyn quit her full-time job to stay at home with their children.

> "The Agreement provided Jalyn and Joseph each possessed property they intended to keep separate from marital property, specifically identified and attached to the Agreement in Exhibits A and B. Exhibit A identified Jalyn's separate property, including a vehicle, savings, and certain household furnishings. Exhibit B identified Joseph's separate property, including a residence on a 54.9 acre tract of land in Scammon [the Homestead], savings, and certain farming equipment and cash crops. The Agreement further required each party to waive any right to spousal support in the event of divorce. The Agreement failed to provide how any subsequently acquired property was to be treated." *In re Marriage of O'Malley*, No. 120,053, 2019 WL 5849811, at *1 (Kan. App. 2019) (unpublished opinion).

The Agreement stated that each party has had "an opportunity to counsel with his or her attorney" relative to the matters set forth and agreed upon in the Agreement and have been fully advised of the facts and circumstances.

The Agreement further stated that Jalyn's estate, as described in Exhibit A, shall remain her separate property, subject entirely to her individual control; and Joseph shall not acquire by reason of said marriage to himself, his heirs, assigns, or creditors, any

interest in her property or estate, or right to control thereof nor any interest in the gross income, increase, rents, profits, or dividends arising therefrom. And Jalyn had the right at any time to dispose of any part or all of her separate property or estate by deed, will, or otherwise. The same terms applied to Joseph and his separate property described in Exhibit B, including any interest in his said property or estate, or right to control thereof nor any interest in the gross income, increase, rents, profits, or dividends arising therefrom.

Under the Agreement, neither party had a right to spousal support in the event of divorce. The Agreement did not specify how any subsequently acquired property was to be treated. 2019 WL 5849811, at *1.

In 2017, Jalyn petitioned for divorce. In March 2018, Jalyn moved the trial court to determine the scope and enforceability of the Agreement. She argued that it was unenforceable because she did not receive advice from independent counsel before signing and because the Agreement did not fully disclose Joseph's debts as required by K.S.A. 2017 Supp. 23-2407(a)(1)-(2).

The parties presented evidence to the trial court at an evidentiary hearing in July 2018 about the circumstances leading to the Agreement. Joseph testified that they talked about a premarital agreement years before the wedding. He intended on keeping his farming operation for himself so that he could keep growing it. Joseph testified that he had always told Jalyn that he would require a prenup before they would get married.

Joseph testified that his attorney, Larry Prauser, drafted the Agreement. Joseph testified that he and Jalyn met with Prauser several months before the marriage to discuss the terms they wanted in the Agreement. Prauser asked them to submit a list of assets which they intended to keep in the event of divorce. Jalyn handwrote her list of assets, which Prauser typed and attached to the Agreement. Jalyn saw Joseph's list and knew that

3

it showed real property worth about $150,000, as well as cash savings, stored grain, and equipment. Jalyn also testified that there was nothing about Joseph's list that she did not understand. Jalyn testified that she did not consult with an attorney, but she "skimmed over" the Agreement before signing it and understood its terms.

Joseph testified that in the eight or nine years before the marriage, Jalyn lived on the farm where he had sheds, farm equipment, crops, and cattle. Joseph stated that Jalyn "had to be aware" of the farming operation because she helped move cattle and equipment and she knew what the crops were.

But Jalyn testified that she was not involved in any decision making, Joseph did not consult with her, and she did not know specifics about crops and debts. Jalyn testified that they did not commingle their incomes before marriage. But she did see the list of assets attached to the Agreement, including the cash savings, stored grain, and various items of equipment and their value. She also testified that when their second child was born, Joseph told her to quit her job because "he didn't want his children [to be] raised by a baby-sitter."

After the evidentiary hearing, the trial court's order held that the parties had capacity, that the contract was in writing and signed by the parties, and the contract was not against public policy. But the trial court found that Jalyn did not receive the advice of independent counsel and had no understanding of the legal significance of the document she was signing.

Further, the trial court ruled that the parties had abandoned the Agreement in 2003 in favor of an oral postmarital agreement in which Jalyn would stop working to be a stay-at-home mother. The trial court held that the oral postmarital agreement effectively nullified the Agreement. The trial court held that all assets and liabilities acquired after 2002 other than through gift or inheritance would be considered marital property, and

4

assets traded and replaced would be considered co-mingled marital assets to be divided using a fair, just, and equitable rule. But ultimately, the trial court failed to definitively conclude whether Jalyn executed the Agreement voluntarily. After Joseph's interlocutory appeal from the order, this court reversed and remanded. *O'Malley*, 2019 WL 5849811, at *1.

This court held that the oral postmarital agreement could not render the premarital agreement unenforceable. After marriage, a premarital agreement can be revoked only by the execution of another written agreement signed by the parties. K.S.A. 2020 Supp. 23-2406. This court directed the trial court to determine the validity of the Agreement on remand. 2019 WL 5849811, at *5.

The trial court issued a Memorandum and Order on Remand without hearing additional evidence. The trial court held that Jalyn did not voluntarily execute the Agreement, the Agreement was unconscionable when executed, and the Agreement did not adequately disclose Joseph's financial obligations.

Joseph moved the trial court to certify the order for interlocutory appeal. The trial court denied Joseph's motion as untimely and proceeded to trial. The trial ran for three days in January 2021.

Joseph testified that he maintains two checking accounts, one at CBW Bank and another at the Exchange State Bank. Joseph deposited virtually all income into his CBW account, which he has maintained since he was 14 years old. When Joseph's business produced and sold grain, the proceeds went into the CBW account. Use of the account at Exchange State Bank was very limited. Joseph used the Homestead that he bought in 1990 as collateral to buy the next piece of property. Joseph paid off debts on subsequent parcels of land through proceeds from the farming operation.

Joseph deposited all revenue from the farming operation into his two accounts, primarily the CBW account. Joseph testified that Jalyn never had access to any of his bank accounts and could not write checks from those accounts. Joseph paid all his bills through his two accounts, including his personal credit card bills.

Joseph testified that he is the sole owner of the farming business, has no partners, and considers all land and equipment to be one farming operation. When buying land in the early years of his business, Joseph used his parents as cosigners on deeds to secure mortgages from Farm Credit Services. All loans which his parents cosigned have been paid off and Joseph now owns the property clear of any interest from his parents.

Jalyn testified that before the marriage she worked full time and also helped on the farm. Before the marriage, Jalyn's full-time job was physical labor at a door manufacturing company. Jalyn testified that she was a regular participant in the farming operation in the years of living together before marriage, helping Joseph with farm labor. But she agreed that Joseph ran the farm. She stated the following:

> "I mean, basically, I was just an employee to him. I mean, I could haul hay like nobody's business. I took care of his cattle. I grained cattle. . . . I never actually disked a field or planted a field, but anything else he needed me to do, I did it."

Jalyn testified that she had no knowledge or input when it came to the sale of grains or produce. Jalyn testified that Joseph never consulted her about acquisitions of property or equipment, never involved her in farming operation decisions, and never informed her of what income the farming operation produced. As for selling grain and paying bills, Jalyn testified that she was "on a need-to-know basis" with Joseph.

Jalyn knew that Joseph regularly bought new farm equipment during the marriage. She never objected to the purchase of farm equipment or land or questioned Joseph's

business judgment. Jalyn testified that Joseph's acquisitions of property and farm equipment were good business decisions.

At trial, Jalyn testified that before the marriage they shared expenses and income. During the marriage, she could not access either the CBW account or the Exchange State Bank account, her name was never on either account, and she never signed checks from either account. She asked Joseph for money to buy groceries and he would provide her with his personal credit card, which she would have to return to him. Jalyn testified that Joseph was a bit controlling when they dated, and he became worse after they married. He became increasingly controlling and verbally abusive, describing her as "his worst piece of property that he has owned in 26 years." She also testified that instead of having funds of her own, Joseph provided her a monthly allowance of $200 a month for personal use such as haircuts and clothes. If she exceeded that $200, she would have to pay Joseph back.

Near the end of trial, Joseph testified about the assets he had at the beginning of the marriage. Although the list of assets was attached to the premarital agreement, the trial court limited discussion to the property and not the Agreement itself. The trial court judge stated, "You can talk about the assets, what they are, where they were, where they are today. I don't care. You can talk about that. But not into the formation of the document."

Joseph testified that he owned 1,300 acres of land, most of which was suitable for agriculture. He testified that, with help from his two sons, he farmed the tillable portion of his land, and he farmed another 1,800 acres that he leased. He testified that farmland was very competitive with neighbors and contiguous farmland would be difficult to rent or buy in southeast Kansas. According to Joseph, if he lost any acreage, he would be stuck with equipment for land he no longer owned or farmed, crippling his business. Appraisers valued the farmland at close to $4.5 million. Joseph testified that he preferred

the court to set aside all farmland and equipment to him, allowing him to pay Jalyn her portion of the marital estate's net worth over time.

Joseph testified that assets listed in the Agreement were no longer in his possession. He traded in the equipment to buy newer equipment and sold the harvested grain to fund the farming operation. The only remaining item listed in the Agreement is the Homestead, which the trial court awarded to Joseph. All other described items were disposed of during the marriage through sale, trade, or disuse, with no record of how any proceeds were used. No record tracks the proceeds from crops generated from the Homestead, which the Agreement identified as belonging solely to Joseph. Most real estate acquired during the marriage was held in joint tenancy with rights of survivorship. Joseph did not have a method for recording income which separated revenue by property.

In the trial court's final order, it awarded the Homestead to Joseph. The court ordered Joseph to buy Jalyn's interest in a second property, which served as the marital residence. The trial court awarded 677.56 acres of farmland valued at $2,141,066 to Jalyn and awarded 643.44 acres of farmland valued at $2,033,460 to Joseph. It awarded Joseph all farming equipment valued at $1,796,088. The court assigned all debt, except for Jalyn's vehicle, totaling $1,112,841 to Joseph. The court also awarded Jalyn $458,778 from grain stored in O'Malley Fertilizer & Grain, LLC; $18,300 from the CBW account; $5,000 from the Exchange State Bank account; and an equalization payment of $120,000 payable to Jalyn over a three-year term without interest.

Joseph moved for a new trial or, in the alternative, to alter or amend the judgment. The trial court denied Joseph's motion.

Joseph timely appeals.

ANALYSIS

*Did the trial court err in finding that the premarital agreement was unenforceable?*

On appeal, Joseph argues that the trial court erred in finding the Agreement unenforceable. Jalyn argues that it does not matter because the trial court's division of property ultimately conformed to the Agreement, particularly in assigning the Homestead to Joseph. The trial court's final order referred to its decision on the enforceability of the Agreement as "mostly irrelevant" after three days of testimony covering the marital assets.

*Was the Agreement voluntarily executed?*

Joseph argues four reasons that the Agreement is enforceable, and the trial court erred in finding it unenforceable. First, he argues that the Agreement meets all the requirements of the Kansas Uniform Premarital Agreement Act (KUPAA) and the trial court's earlier rulings implicitly found the Agreement valid. Second, he argues that the trial court erred in its focus on Jalyn's lack of independent counsel because Kansas law does not require independent counsel for the Agreement to be enforceable. Third, he argues that the trial court erred in finding that the financial disclosure was insufficient under K.S.A. 2020 Supp. 23-2407(a)(2). Finally, Joseph argues that, under the Agreement, the trial court should have awarded all farm property to him. Thus, Joseph seeks a remand for a new trial so that the trial court can proceed as though the Agreement is enforceable and divide the marital property accordingly.

Premarital agreements are contracts subject to the same rules as other contracts. *O'Malley*, 2019 WL 5849811, at *3.

An appellate court exercises unlimited review over the interpretation and legal effect of written instruments and is not bound by the lower court's interpretations or

rulings. Whether a written instrument is ambiguous is a question of law subject to de novo review. *Trear v. Chamberlain*, 308 Kan. 932, 936, 425 P.3d 297 (2018).

The trial court has discretion to grant or deny a motion for new trial under K.S.A. 2020 Supp. 60-259(a), and an appellate court will not disturb the district court's ruling on a motion for new trial unless the district court abused its discretion. *City of Mission Hills v. Sexton*, 284 Kan. 414, 421, 160 P.3d 812 (2007).

A judicial action constitutes an abuse of discretion if (1) it is arbitrary, fanciful, or unreasonable; (2) it is based on an error of law; or (3) it is based on an error of fact. *Biglow v. Eidenberg*, 308 Kan. 873, 893, 424 P.3d 515 (2018).

The party asserting the district court abused its discretion bears the burden of showing such abuse of discretion. *Gannon v. State*, 305 Kan. 850, 868, 390 P.3d 461 (2017).

Premarital agreements are governed by the KUPAA. See K.S.A. 2020 Supp. 23-2401 et seq. Under the KUPAA, a premarital agreement is "an agreement between prospective spouses made in contemplation of marriage and to be effective upon marriage." K.S.A. 2020 Supp. 23-2402(a). A premarital agreement must be in writing and signed by both parties. K.S.A. 2020 Supp. 23-2403. Parties can enter into a premarital agreement to determine how property will be held after marriage; to provide for the disposition of property upon death or divorce; and to provide for, or waive, spousal support obligations. See K.S.A. 2020 Supp. 23-2404. A premarital agreement is enforceable as long as it was voluntarily executed and not unconscionable. K.S.A. 2020 Supp. 23-2407(a).

The party challenging the enforceability of the premarital agreement must show that it is unenforceable. The party must show the following:

"(1) That party did not execute the agreement voluntarily; or

"(2) the agreement was unconscionable when such agreement was executed and, before execution of the agreement, all of the following applied to that party:

(A) Such party was not provided a fair and reasonable disclosure of the property or financial obligations of the other party;

(B) such party did not voluntarily and expressly waive, in writing, any right to disclosure of the property or financial obligations of the other party beyond the disclosure provided; and

(C) such party did not have, or reasonably could not have had, an adequate knowledge of the property or financial obligations of the other party." K.S.A. 2020 Supp. 23-2407(a).

In *Davis v. Miller*, 269 Kan. 732, 7 P.3d 1223 (2000), our Supreme Court laid out the trial court's considerations for voluntariness under the KUPAA. The *Davis* court stated the following:

"'To determine if the agreement was voluntary, the court will focus on the surrounding facts and circumstances. These include the situation of the parties as compared to each other, such as their respective ages, educational backgrounds, business experience, property, family ties and connections. Additionally the court will look at the circumstances leading up to the execution of the contract and marriage, such as timing of the presentation and execution of the agreement, who drafted the agreement, provisions for the dependent spouse, statements made by the party wanting the agreement, if there was independent legal counsel, and who was present at the execution of the agreement. Absent a showing of undue influence or fraud, the agreement will be upheld.' 1 Elrod and Buchele, Kansas Family Law § 2.24, pp. 99-100." 269 Kan. at 741.

Courts may also consider whether a party had the advice of counsel, with the presence of counsel weighing heavily in favor of a voluntary agreement. *Davis*, 269 Kan. at 741; see also *In re Marriage of Stout*, 261 Mont. 10, 14, 861 P.2d 856 (1993) (finding no merit in the wife's argument that the agreement was not voluntary when it was executed at her suggestion and drafted by her attorney); *In re Estate of Lutz*, 563 N.W.2d

90, 98 (N.D. 1997) (holding that the advice of counsel is a "significant factual factor" in determining the voluntariness of a premarital agreement and that legal representation is "often . . . the best evidence" that an agreement was voluntarily signed).

After remand from this court, the trial court held that the Agreement was not enforceable. K.S.A. 2020 Supp. 23-2407(a) requires Jalyn to prove either: (1) She did not execute the agreement voluntarily, or (2) the agreement was unconscionable and the financial disclosure was defective. The trial court found that Jalyn showed that both (1) and (2) were true.

Joseph argues that the parties had the capacity to contract, the contract was in writing and signed by the parties, and there was no fraud or coercion. K.S.A. 2020 Supp. 23-2403. Joseph further argues that the trial court implicitly found the Agreement valid and enforceable. That is, he notes that the trial court ruled earlier that the parties abandoned the Agreement in favor of an oral postmarital agreement. Joseph contends that for the trial court to find that the parties abandoned the Agreement, then it must have found it to be a valid contract.

This court remanded to the trial court instructing it to determine the validity of the Agreement. Joseph's assertion that the trial court already implicitly found the Agreement valid is unpersuasive. There would have been no need for remand if the trial court had implicitly held that the Agreement was valid and that holding was binding as the law of the case.

Joseph also asserts that the trial court erred by relying solely on Jalyn's lack of independent counsel to find that the Agreement was not voluntarily executed. But Joseph misstates the trial court's holding on voluntariness. He incorrectly asserts that the trial court relied on just 1 of 12 relevant factors from *Davis*, the presence or absence of counsel. But the trial court did not make its determination on the factor of independent

12

counsel alone. Instead, it cited *Davis* and recounted several factors of voluntariness before holding as follows:

> "Jalyn did not receive the advice of independent counsel and had no understanding of the legal significance of the document she was signing, and did not waive her right to counsel.
>
> . . . .
>
> "The circumstances surrounding the signing of the agreement are that the agreement was presented by [Joseph] Jody O'Malley, to Jalyn O'Malley on September 21, 1999. The agreement was signed the same date it was presented to Jalyn O'Malley. The Liabilities section of the assets and liabilities for Jody O'Malley does not exist and was not disclosed to Jalyn O'Malley. In spite of the argument by Jody O'Malley that the information was available to Jalyn O'Malley because his mail came to the house, he kept his books in his office at the house, and Jalyn could have looked at the bills, financial statements and tax returns if she wanted to. Clearly Jody O'Malley has testified he never reviewed and discussed his finances with Jalyn O'Malley prior to requesting her to sign the premarital agreement. Jalyn O'Malley testified and the Court finds the information was not maintained at the house because Jody O'Malley's mother did all of Jody's bookkeeping and kept the records at her house. Jalyn O'Malley did not have access and the Court finds that Jalyn did not have knowledge of the liabilities of Jody O'Malley prior to signing the prenuptial agreement. Jalyn O'Malley testified and the Court finds that the Prenuptial Agreement was presented to Jalyn O'Malley three days before the wedding with the requirement that she sign the agreement or there would be no wedding."

Thus, the trial court explicitly considered the surrounding facts and circumstances, including the parties' comparative situations. In its discussion of Joseph's mother, the trial court considered the parties' family ties and connections: One party had family assistance in tracking finances. The trial court recounted the circumstances preceding the Agreement's execution, including when the Agreement was presented and by whom—it was presented by Joseph three days before the wedding and signed immediately. And the trial court at least implicitly considered the parties education and business experience—Jalyn has no education beyond high school and had no business experience. Similarly,

13

when Jalyn first moved in Joseph was 19 years old, a high school graduate, and just starting as an entrepreneur. But by 1999 when the Agreement was signed, Joseph was 28 years old, and had the benefit of counsel, who prepared the Agreement on his behalf.

Joseph argues legal error by noting the trial court's citation to *In re Estate of Lutz*. He argues that Jalyn is similarly situated to the wife in *Lutz*. The *Lutz* court held that the advice of counsel is a "significant factual factor in weighing the voluntariness of a premarital agreement." 563 N.W.2d at 98. But Joseph points out that the *Lutz* court focused on other factors which make it like Jalyn's claim, including the following:

(1) The wife in *Lutz* read the agreement before signing; (2) she understood the effect of the documents; (3) she was asked if she understood the documents; (4) she was asked if she had any questions; (5) she did not ask any questions; (6) she was asked if she wanted to sign the document; and (7) she signed the document.

But Joseph misstates the holding of *Lutz*, claiming that the *Lutz* court upheld the agreement because the record lacked any basis to conclude that the premarital agreement should be set aside. This is not correct. Rather, the *Lutz* court held that a genuine issue of fact remained, summary judgment was inappropriate, and remand was necessary to determine the voluntariness and enforceability of the agreement. 562 N.W.2d at 99.

Thus, Joseph's appellate argument is ultimately the dispute of a fact question. After his erroneous claim that the trial court relied solely on Jalyn's lack of counsel to make its ruling, Joseph recounts in his brief several facts which weigh in favor of finding that she executed the Agreement voluntarily. But it is readily apparent from the trial court's ruling that it considered the facts mentioned by Joseph and weighed those facts against others which tended to show that Jalyn did not voluntarily execute the Agreement.

In some cases, Joseph points to contradictory evidence which the trial court resolved contrary to his position. For example, he points to his own testimony that a copy of the Agreement was delivered to the house shortly after August 2, 1999. Joseph did not testify that he gave the Agreement to Jalyn but stated that Jalyn had access to the Agreement because it was out in the open on a roll top desk in his office. Jalyn testified that she did not look through documents on his roll top desk. She also testified that she did not see the Agreement until the day she signed it, September 21, 1999, three days before the wedding. Under Joseph's narrative, Jalyn would have had from early August to late September 1999 to review the Agreement and attached financial disclosures—ample time to consult independent counsel. But Jalyn's testimony implied a few hours, or even a few minutes, to review the documents before signing on September 21, 1999. The trial court made its factual finding that Jalyn first saw, and signed, the Agreement on September 21, 1999. The trial court also determined for itself how much weight to give this factor—Jalyn's scant opportunity for review—in finding whether execution was voluntary.

Discussion of independent counsel follows logically from the timing of the Agreement signing and the wedding. Joseph points out that Jalyn testified that she knew she could meet an attorney if she wanted. He also points to his own testimony that Jalyn mentioned wanting to have an attorney named Darrell Shumake review the Agreement. But the trial court's finding that Jalyn reviewed and signed the Agreement three days before the wedding would factor into consideration of whether she had a meaningful chance to seek independent counsel, regardless of her awareness of the right to counsel. Joseph asserts that the trial court committed a legal error by relying on a singular factor, but the trial court clearly weighed multiple factors. Thus, his assertion of legal error must fail.

Joseph also misstates this court's standard of review by stating the following: "There is substantial competent evidence to support a finding contrary to the District

15

Court's findings." But appellate courts review the record to determine whether substantial competent evidence supports the trial court's factual findings. *In re Marriage of Welter*, 58 Kan. App. 2d 683, 687, 474 P.3d 786 (2020). Typically, under substantial competent evidence review, appellate courts must accept as true the evidence and all the reasonable inferences drawn from the evidence which support the trial court's findings and must disregard any conflicting evidence or other inferences that might be drawn from it. *Gannon*, 305 Kan. at 881. An appellate court errs by holding that substantial competent evidence supports a finding contrary to the trial court's findings. *State, ex rel. Secretary, DCF v. M.R.B.*, 313 Kan. 855, 863, 491 P.3d 652 (2021). Appellate courts do not weigh conflicting evidence, pass on the credibility of witnesses, nor redetermine questions of fact. *In re Marriage of Skoczek*, 51 Kan. App. 2d 606, 608, 351 P.3d 1287 (2015). Joseph asks this court to go beyond finding that the trial court improperly weighed certain factors of voluntariness. He asks this court to reweigh the evidence underpinning each factor, arrive at different conclusions from the trial court, and then reweigh the factors to find that Jalyn voluntarily executed the Agreement. Joseph's argument must fail because what he requests is simply beyond the scope of our review.

Under K.S.A. 2020 Supp. 23-2407, Jalyn needs to show either (1) that she did not execute the Agreement voluntarily or (2) that the Agreement was unconscionable, and the financial disclosure was defective. Jalyn does not need to show both. Because the trial court correctly held that Jalyn did not execute the Agreement voluntarily, we can affirm the trial court without the need to analyze the Agreement's unconscionability and the inadequacy of the financial disclosure. Nevertheless, we will assume for the sake of argument that Jaylyn voluntarily signed the Agreement and consider if the trial court's unconscionability ruling was also proper.

16

*Was the Agreement unconscionable and was the financial disclosure defective?*

Joseph repeats his mistake about this court's standard of review when discussing unconscionability. He asserts that substantial uncontroverted evidence supports the determination that the Agreement was not unconscionable and was voluntarily executed. But the trial court held that the Agreement was unconscionable, and this court reviews the record for substantial competent evidence which supports the trial court's conclusion. *M.R.B.*, 313 Kan. at 863.

K.S.A. 2020 Supp. 23-2407(a) provides that a premarital agreement is not enforceable if the party against whom enforcement is sought proves the following:

> "(2) [T]he agreement was unconscionable when such agreement was executed and, before execution of the agreement, all of the following applied to that party:
> (A) Such party was not provided a fair and reasonable disclosure of the property or financial obligations of the other party;
> (B) such party did not voluntarily and expressly waive, in writing, any right to disclosure of the property or financial obligations of the other party beyond the disclosure provided; and
> (C) such party did not have, or reasonably could not have had, an adequate knowledge of the property or financial obligations of the other party."

The trial court held that Joseph's disclosure of financial obligations was defective under all three requirements. The trial court found that Jalyn was not provided a fair and reasonable disclosure of Joseph's financial obligations; that she did not expressly waive, in writing, any right of disclosure of his financial obligations; and that she reasonably could not have had an adequate knowledge of his financial obligations. Joseph's argument that Jalyn knew or reasonably could have known of Joseph's assets does not address the trial court's finding about Joseph's debts. Joseph also seems to misread K.S.A. 2020 Supp. 23-2407 and *Davis*.

17

The plain language of K.S.A. 2020 Supp. 23-2407(a)(2) provides four elements which must all be met for the Agreement to be unenforceable. That is, the Agreement must be unconscionable, and the financial disclosure must suffer three defects: one party is not given a fair and reasonable disclosure, such disclosure is not waived, and the party could not reasonably have known the information without the disclosure. Reading K.S.A. 2020 Supp. 23-2407(a)(2) requires careful attention to how "and" and "or" create conjunctions and disjunctions. Subsection (a)(2) requires Jalyn to show that the agreement was unconscionable when executed *and* the financial disclosure was inadequate in three ways. Thus, "[u]nder the KUPAA, unconscionability is only an issue if there is 'inadequate disclosure [of assets]'" because the disclosure suffers from all three defects listed in K.S.A. 2020 Supp. 23-2407(a)(2)(A)-(C). *Davis*, 269 Kan. at 742. If Jalyn failed to show the trial court that the disclosure was defective in all three ways, then her arguments of unconscionability would fail because the conjunctive language of the statute required her to show all four components.

But Joseph incorrectly argues a causative relationship. He asserts that "[i]n order to be unconscionable, all three factors must be met under K.S.A. 23-2407(a)(2)." But the three financial disclosure defects are separate from unconscionability, as *Davis* illustrated. The *Davis* court analyzed unconscionability separately, in Part III of the opinion, stating the test for unconscionability. 269 Kan. at 742-43. The *Davis* court then addressed each of the three alleged inadequacies of the financial disclosure separately.

The facts of *Davis* and the court's reasoning are helpful because of the stark contrast between Charline Davis and Jalyn O'Malley. It is hard to imagine two women more dissimilar in situation. Davis married Steven K. Miller in 1967. Miller founded General Financial Services (GFS) in 1988. He owned 72.2% of the company in March 1994, when he filed for divorce. But Davis and Miller did not finalize the divorce, instead reconciling and executing a postnuptial agreement in December 1994. Then, in November 1995, Miller filed a second divorce action.

Much of the dispute in *Davis* centered on the value of GFS as one of Miller's assets. The nature of the business made the company difficult to value. GFS purchased distressed nonperforming real estate loans to profit from collecting on the loans or selling the collateral. After acquiring a loan package, GFS would value the package and learn that the loan package had either greater value or less value than the prepurchase evaluation suggested. GFS stated its assets and liabilities using "book value," but the "fair market value" was significantly more. 269 Kan. at 734, 736. Davis brought an action for fraud and breach of contract, asserting that if she had known that GFS' fair market value was more than twice the book value, she would not have signed the postnuptial agreement.

But Davis was not exactly in the dark about financial matters at GFS. "Miller disclosed to Davis and her attorney and accountant that GFS had expectations of future potential profits not reflected on the financial statement, but neither Davis nor her attorney made a request for an adjustment to the allocation of assets based on the disclosures of anticipated profits." 269 Kan. at 735. And Davis was an investor in GFS before, during, and after the divorce proceedings and received periodic investor reports. In fact, she brought her claims against Miller because she received, as an investor, remaining value reports which valued GFS higher than the book value which served as the basis for the postnuptial agreement. The *Davis* court held that Davis "was in a position of knowledge that is far superior to that of a young bride signing an agreement *before* the marriage" and that she was experienced in business and accustomed to handling her own financial affairs. 269 Kan. at 743-44, 746. The *Davis* court carefully specified that postnuptial agreements differ significantly from prenuptial agreements and the only reason that the KUPAA applied was because the agreement itself expressly stated that it would be governed by the KUPAA. 269 Kan. at 739.

A review of the record shows that Jalyn was not similarly situated to Davis. The financial disclosures that Miller made to Davis, and her attorney and her accountant,

differed from the list of assets that Jalyn had available when she signed her prenuptial agreement. In a sense, the dispute in *Davis* arose from including liabilities. That is, the book value of GFS was the corporation's assets minus its liabilities, divided by the number of shares outstanding. 269 Kan. at 745. But the fair market value of GFS was far higher because it did not include, for example, overhead expenses. Here, the trial court found the opposite problem because Joseph disclosed to Jalyn all assets and no liabilities. Admittedly, Joseph correctly argues that Kansas courts have held that an exact dollar amount need not be stated if there is a "general knowledge" of the nature and extent of the assets of each party. *In re Estate of Broadie*, 208 Kan. 621, 627, 493 P.2d 289 (1972); see also *In re Estate of West*, 194 Kan. 736, 745-46, 402 P.2d 117 (1965) (upholding a marital agreement when the party knew that her future husband was wealthy but did not know the extent of his wealth); *In re Estate of Ward*, 178 Kan 366, Syl. ¶ 1, 371, 285 P.2d 1081 (1955) (holding that the husband did not need to "disclose in detail" his assets because his wife knew that he was a "man of some means" and he had not fraudulently concealed his assets). But Joseph is incorrect in comparing an approximate disclosure of assets with no disclosure of liabilities. Joseph gave Jalyn no idea of how much debt he was bringing into the marriage with him. The trial court correctly found that Jalyn had shown that she was not provided a fair and reasonable disclosure of Joseph's financial obligations.

And Jalyn also did not participate in the business in a way which resembles *Davis*. Joseph did not consult her on any decision making. Jalyn summarized the relationship stating the following, "He treated me like an employee and not a wife." She "could haul hay like nobody's business," but could not access records of proceeds and expenses. The trial court found that Jalyn did not waive her right to a financial disclosure, and Joseph offers no argument that the trial court erred on this point. But Joseph argues that the trial court erred in finding that Jalyn did not have and reasonably could not have had adequate knowledge of his financial obligations. But review of the record shows substantial competent evidence to support the trial court's conclusion that Jalyn did not have

20

reasonable access to financial information about Joseph's farming operation, both during the marriage and before signing the Agreement.

Thus, the trial court correctly found that Jalyn met her burden to show the three defects in the financial disclosure required by K.S.A. 2020 Supp. 23-2407(a)(2)(A)-(C). Joseph did not provide a fair and reasonable disclosure. Jalyn did not waive, in writing, any right to disclosure. And Jalyn could not have had adequate knowledge. But a fourth requirement remains. Jalyn needed to prove to the trial court that the Agreement was unconscionable when executed.

Again, *Davis* is useful here because the *Davis* court laid out the test for unconscionability as follows:

> "'[T]he terms of the agreement respecting maintenance and property disposition are binding upon the court unless those terms are found to be unconscionable. The standard of unconscionability is used in commercial law, where its meaning includes protection against one-sidedness, oppression, or unfair surprise, and in contract law. It has been used in cases respecting divorce settlements or awards. Hence [K.S.A. 2020 Supp. 23-2407(a)(2)] does not introduce a novel standard unknown to the law. In the context of negotiations between spouses as to the financial incidents of their marriage, the standard includes protection against overreaching, concealment of assets, and sharp dealing not consistent with the obligations of marital partners to deal fairly with each other.
>
> "'In order to determine whether the agreement is unconscionable, the court may look to the economic circumstances of the parties resulting from the agreement, and any other relevant evidence such as the conditions under which the agreement was made, including the knowledge of the other party. If the court finds the agreement not unconscionable, its terms respecting property division and maintenance may not be altered by the court at the hearing.'" 269 Kan. at 742-43.

The trial court's finding on unconscionability is not exhaustive in its reasoning. The court's Memorandum and Order merely noted "As stated in the paragraph above, this

21

Court makes all necessary findings contained in K.S.A. 2018 Supp. 23-2407(a)(2), (A), (B), and (C). The Agreement was unconscionable when executed . . . ." That is, the trial court simply referred to the same facts which supported its finding that Jalyn did not execute the Agreement voluntarily. The trial court's previously stated facts focused largely on Jalyn lacking knowledge of Joseph's liabilities. If the trial court considered other factors such as the economic circumstances of the parties resulting from the agreement and any other relevant evidence, the trial court did not make such consideration explicit.

But Joseph bears the responsibility to contemporaneously object to inadequate findings of fact and conclusions of law to give the trial court an opportunity to correct any alleged inadequacies. *In re Guardianship and Conservatorship of B.H.*, 309 Kan. 1097, 1107-08, 442 P.3d 457 (2019). Supreme Court Rule 165 (2022 Kan. S. Ct. R. at 234) imposes on the trial court the duty to provide adequate findings of fact and conclusions of law on the record to explain the court's decision on contested matters. See K.S.A. 2020 Supp. 60-252. But when no objection is made to a trial court's findings of fact or conclusions of law based on inadequacy, an appellate court can presume the trial court found all facts necessary to support its judgment. *O'Brien v. Leegin Creative Leather Products, Inc.*, 294 Kan. 318, 361, 277 P.3d 1062 (2012).

Finally, Joseph's only argument about unconscionability is his argument about the three defects in the financial disclosure. He makes no further argument that the trial court misapplied the separate unconscionability test. His confusion is understandable, given how a trial court would consider an inadequate disclosure. K.S.A. 2020 Supp. 23-2407(a)(2)(A)-(C) required Jalyn to show the three defects that the disclosure was not given, not waived, and not otherwise knowable. But also, concealment and lack of knowledge factor into an unconscionability determination. So, the financial disclosure is, in a sense, double counted. The trial court would consider the financial disclosure, along with other factors and relevant evidence, in determining unconscionability. But Joseph

22

has provided no other reasons why the trial court's unconscionability holding was incorrect. Issues not adequately briefed are deemed waived or abandoned. *In re Marriage of Williams*, 307 Kan. 960, 977, 417 P.3d 1033 (2018).

*Did the trial court err in dividing the property between the parties?*

Joseph argues that the trial court improperly divided the property between the parties because the Agreement was enforceable, and Joseph would retain all farm property under the Agreement.

A trial court's division of property in a divorce action is governed by K.S.A. 2020 Supp. 23-2801 et seq. A trial court has broad discretion when adjusting the property rights of the parties involved in a divorce action. As a result, the trial court's property division is reviewed for abuse of discretion. *In re Marriage of Wherrell*, 274 Kan. 984, 986, 58 P.3d 734 (2002); *In re Marriage of Thrailkill*, 57 Kan. App. 2d 244, 261, 452 P.3d 392 (2019).

The trial court found that the assets attached to the Agreement were separate property, but the Agreement failed to provide how any later acquired property was to be treated. But the only original asset remaining was the Homestead property. The parties had disposed of all other assets between getting married in 1999 and filing for divorce in 2017. The trial court held that the enforceability of the Agreement was largely immaterial because the Agreement did not cover the parties' current assets. Or, in the trial court's words: "That Ruling on Remand has become mostly irrelevant following three days of testimony in the final hearing as listed below."

Joseph argues that the ruling on the Agreement's enforceability was in fact relevant because he could not offer evidence at trial about the intention of the parties, the formation of the document, or the circumstances surrounding the acquisition of

subsequent property. Joseph argues that language in the Agreement provided that the source of funds would determine what is separate property and what is not. The relevant language provided that Jalyn would not acquire "any interest in the gross income, increase, rents, profits or dividends" arising from Joseph's property. Thus, Joseph's argument ultimately is that the trial court did not give him an opportunity at trial to provide evidence about how the later property was acquired. He contends that he acquired the later property from the proceeds of the initial property which was solely his under the Agreement.

But here again Joseph asks this court to reweigh the evidence. A review of the record for substantial competent evidence supporting the trial court's rulings shows that Joseph commingled assets. According to testimony from both parties, Joseph deposited nearly all income into the CBW account, which he used to fund both his farm and his marital estate. He gave Jalyn his credit card to buy groceries and paid his credit card bill from the CBW account. Joseph's argument on appeal is partially correct. "The Agreement provided that the source of funds would determine what is separate property and what is not." Joseph could have maintained distinctions between personal finances, marital finances, and business finances. But by financing his marital estate and his farm from one account, Joseph blurred any distinction between "my money" and "our money." The Agreement would have allowed him to maintain his income, increase, rents, profits, and dividends separately. But he did not do this. This may have factored into the trial court's finding that the Agreement was unconscionable when executed because if Joseph had maintained separate finances, he would have retained all assets with no obligation to pay support, leaving Jalyn virtually penniless. But we need not decide such issues of unconscionability because, as previously explained, Joseph has abandoned arguments about the trial court's unconscionability holding. The trial court heard evidence about the course of conduct of nearly 20 years of managing the finances of the farm and the marital estate. The trial court determined that Joseph commingled assets so that the Agreement was "mostly irrelevant." Substantial competent evidence supports the trial court's finding.

The Agreement specified that the Homestead property belonged solely to Joseph. The trial court removed it from the marital assets and set it aside to Joseph as his separate property. The Agreement also prevented either party from receiving maintenance. Jalyn did not seek, and the trial court did not award, maintenance. As the trial court correctly stated, "[T]here is no further need to even consider the Agreement."

The trial court considered the remainder of the marital assets, including real estate which Joseph and Jalyn held as joint tenants with the right of survivorship, and followed K.S.A. 2020 Supp. 23-2802(c) to make a just and reasonable division of property. On appeal, Joseph concedes the apparent contradiction between his assertion that he intended the later acquired farmland to be solely his and the fact that he held most of these properties as a joint tenant with Jalyn. For example, when two parties own property in joint tenancy, they have identical interests in the whole of the property, with the right of survivorship. *In re Estate of Carlson*, 201 Kan. 635, 643-44, 443 P.2d 339 (1968). Joseph's argument that he intended all the later acquired farmland to be his is the logical contradiction of Joseph and Jalyn holding the later acquired farmland as joint tenants with the right of survivorship. These two contradictory propositions can never be true together, or false together; one is always true and the other always false. Because we know that Joseph held much of the later acquired farmland with Jalyn as joint tenants with the right of survivorship, his argument that he intended all the later acquired farmland to be solely his is logically flawed.

Nevertheless, Joseph argues that under the Agreement the source of funds would determine what is separate property and the trial court erred by not giving him an opportunity to provide evidence about how the later property was acquired. But Joseph's argument fails for two reasons. First, the trial court expressly stated that it would allow evidence on the assets, just not the formation of the Agreement. So, Joseph could have presented evidence that the new farmland was purchased with proceeds from only the original Homestead. Second, Joseph testified at trial that he kept no separate records and

that virtually all income went into the CBW account, which he also used to pay for both farm and marital expenses. So, the trial court had substantial competent evidence to conclude that Joseph did not, and could not, show that the property was acquired with solely nonmarital income.

Joseph makes no additional argument that the trial court's division of property was not just or reasonable. His sole argument is that the trial court erred by not awarding him all property under the Agreement. An issue not briefed is deemed waived or abandoned. *Williams*, 307 Kan. at 977. The trial court correctly determined that the only remaining asset which it would award to Joseph under the Agreement, if it was enforceable, was the Homestead. The Agreement contained no provisions on how to treat property later acquired by the couple. And Joseph did not maintain or create an asset acquisition system which would have allowed the trial court to identify the later acquired property as either marital or individual. As a result, the trial court correctly identified the remaining property as marital property and made a just and reasonable division of the marital property.

For the preceding reasons, we affirm.